(No. 89059.

**MIDSTATE SIDING AND WINDOW COMPANY, INC., Appellant, v. KENNETH ROGERS** *et al.*, Appellees.

*Opinion filed April 24, 2003.*

RARICK, J., took no part.

KILBRIDE, J., dissenting.

Chester C. Fuller, of Peoria, for appellant.

John R. Rehn, of Galesburg, for appellees.

JUSTICE FREEMAN delivered the opinion of the court:

In this appeal, we are asked to determine whether the Credit Services Organizations Act (Credit Services Act) (815 ILCS 605/1 *et seq.* (West 1996)) applies to a transaction between a retailer, Midstate Siding and Window Company, Inc. (Midstate), and homeowners Kenneth and Ella Rogers (Rogers). We find that the Credit Services Act does not apply. Consequently, we reverse the judgments of the appellate court and circuit court, and remand for further proceedings.

## BACKGROUND

On December 2, 1996, Midstate filed a complaint in the circuit court of Knox County against the Rogers. In the complaint, Midstate alleged that it is in the home remodeling business, and that on July 24, 1996, it entered into a contract with the Rogers to install windows and siding at their home at a cost of $19,600. Midstate further alleged that the Rogers breached the contract by refusing to allow Midstate to perform the work at their home. Midstate sought damages of $4,000 for lost profit, costs and overhead. Midstate also sought to recover its costs of suit and attorney fees. Midstate attached a copy of the contract to its complaint.

In their answer to the complaint, the Rogers admitted that Midstate is in the home remodeling business, and that they signed the contract attached to the complaint. The Rogers also admitted notifying Midstate that they did not want Midstate to perform the work at their home. However, the Rogers maintained that the contract is not enforceable because: (1) it lacks definite and certain terms; (2) it violates the Credit Services Act (815 ILCS 605/1 *et seq.* (West 1996)), and the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 1996)); (3) the Rogers informed Midstate of their intent to cancel the contract on July 28,

1996; (4) Midstate failed to obtain credit for the Rogers, a condition precedent to performance of the contract; (5) no payment is due under the terms of the contract; and (6) the Rogers believed they were signing an estimate, not a contract. In addition, the Rogers filed a counterclaim against Midstate. In the counterclaim, the Rogers alleged that Midstate's salesman, Alan Klunk, indicated that Midstate would obtain financing for the Rogers and/or provide advice or assistance to the Rogers in obtaining an extension of credit. However, in the contract, Midstate failed to describe the services Midstate was to provide in obtaining the extension of credit for the Rogers, in violation of the Credit Services Act and the Consumer Fraud and Deceptive Business Practices Act. The Rogers sought an award of court costs, attorney fees and punitive damages.

Midstate admitted that the Rogers filled out a credit application, and that Midstate forwarded the application to several lending institutions to obtain financing for the Rogers. Bank One, Illinois, N.A., one of the institutions Midstate contacted, agreed to provide a home equity loan to the Rogers. In a letter dated July 30, 1996, Bank One advised the Rogers of its commitment to lend the Rogers the sum of $24,000 at prime plus 3.15%. Midstate maintained that it provided a gratuitous service to the Rogers in forwarding their credit application to the financial institutions.

The matter proceeded to a bench trial at which testimony was heard but not recorded. Following the trial, the circuit court issued a letter opinion as follows:

"I have considered the evidence and your arguments. I find that the Credit Services Organization Act is applicable to the case at bar. I have considered the cases and find that the Act is to be liberally construed to protect consumers. Plaintiff qualifies as a Credit Services Organization i.e., that Plaintiff represented to Defendant that it would assist or obtain for her an extension of credit.

The contract between Plaintiff and Defendant is thereby unenforceable in that it does not comply with [815] ILCS 605/7.

Plaintiff argued that inadequate consideration existed to support a credit contract. This was simply not true. In order to remain competitive, the Plaintiff offered a service to prospective buyers to assist them in obtaining financing to purchase siding and windows. In fact, the agreement between the Plaintiff and Defendant would never have been consummated had the Plaintiff not helped them obtain financing. The Plaintiff's assistance was more than a mere service, but was part of the consideration to support the agreement."

The circuit court awarded the Rogers attorney fees and costs in the amount of $6,157.50. However, the court found that the Rogers were not entitled to an award of punitive damages. Subsequently, the circuit court denied Midstate's motion to reconsider and clarified that Midstate had violated section 7(a)(2) of the Credit Services Act (815 ILCS 605/7(a)(2) (West 1996)).

The appellate court affirmed the judgment of the circuit court, with one justice dissenting. 309 Ill. App. 3d 610. The appellate court reasoned that the Credit Services Act applies to retailers who, in exchange for valuable consideration, aid consumers in obtaining extensions of credit. 309 Ill. App. 3d at 611. The appellate court held that, by providing assistance to the Rogers with regard to obtaining an extension of credit as part of an agreement to side their home, Midstate acted within the purview of the Credit Services Act. In addition the court held that the Rogers were entitled to appellate attorney fees under the Credit Services Act.

We granted Midstate's petition for leave to appeal. 177 Ill. 2d R. 315.

## ANALYSIS

### A. Record on Review

As noted above, a transcript of the evidence at trial is

not available because the trial was not recorded. In the absence of a transcript, it is incumbent upon the appellant to file a bystander's report of the proceedings (166 Ill. 2d R. 323(c)) or an agreed statement of facts (166 Ill. 2d R. 323(d)). Midstate failed to do so, leading the Rogers to argue that we must affirm the judgments of the lower courts because the record on review is incomplete. We disagree.

Midstate, as appellant, has the burden of presenting a sufficiently complete record of the proceedings at trial to support a claim of error (*Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984); *Landeros v. Equity Property & Development*, 321 Ill. App. 3d 57, 63 (2001)), and, in the absence of such a record on appeal, the reviewing court will presume that the order entered by the trial court was in conformity with the law and had a sufficient factual basis (*Webster v. Hartman*, 195 Ill. 2d 426, 433 (2001); *Foutch*, 99 Ill. 2d at 392). The court will resolve any doubts arising from the incompleteness of the record against the appellant. *Foutch*, 99 Ill. 2d at 392; *In re K.S.*, 317 Ill. App. 3d 830, 832 (2000). However, in the present case, we are not asked to determine whether the evidence presented at trial was sufficient to support the trial court's finding. See *Buckholtz v. MacNeal Hospital*, 313 Ill. App. 3d 521, 526 (2000) (plaintiff maintained that the record fails to establish that an expert witness' deposition fee was reasonable). Instead, we are asked to interpret a statute, the Credit Services Act, and determine whether the statute regulates the transaction at issue. This is a question of law, and the lack of a complete record does not bar our review. *Candice Co. v. Ricketts*, 281 Ill. App. 3d 359, 362 (1996); *In re Estate of Day*, 261 Ill. App. 3d 993, 996 (1994); *In re B.H.*, 218 Ill. App. 3d 583, 586 (1991). Further, because the issue before us is a matter of statutory construction, our review is *de novo*. *Sylvester v. Industrial Comm'n*, 197 Ill. 2d 225, 232

(2001); *Bridgestone/Firestone, Inc. v. Aldridge*, 179 Ill. 2d 141, 148 (1997).

## B. Credit Services Act

In determining whether the Credit Services Act applies to the transaction at issue, we are guided by established principles. The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. *Bridgestone*, 179 Ill. 2d at 149, quoting *Illinois Power Co. v. Mahin*, 72 Ill. 2d 189, 194 (1978); *In re B.C.*, 176 Ill. 2d 536, 542 (1997). To do so, we examine the language of the statute, the most reliable indicator of the legislature's objectives in enacting the law. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 504 (2000). We afford the language of the statute its plain and ordinary meaning (*Michigan Avenue National Bank*, 191 Ill. 2d at 504) and construe the statute as a whole (*Sylvester*, 197 Ill. 2d at 232). Words and phrases must not be viewed in isolation but must be considered in light of other relevant provisions of the statute. *Sylvester*, 197 Ill. 2d at 232; *Michigan Avenue National Bank*, 191 Ill. 2d at 504. We also presume that in enacting the statute the legislature did not intend absurdity, inconvenience, or injustice. *Michigan Avenue National Bank*, 191 Ill. 2d at 504.

Where the language of the statute is clear and unambiguous, the only legitimate function of the courts is to enforce the law as enacted by the legislature. *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 391 (1998). It is never proper for the courts to depart from the plain language of the statute by reading into it exceptions, limitations or conditions which conflict with the intent of the legislature. *Bridgestone*, 179 Ill. 2d at 149, quoting *Harvey Firemen's Ass'n v. City of Harvey*, 75 Ill. 2d 358, 363 (1979). There is no rule of statutory construction which authorizes the courts to declare that the legislature did not mean what the plain language of the

statute says. *Henrich*, 186 Ill. 2d at 391; *Bridgestone*, 179 Ill. 2d at 149.

With these principles in mind, we turn to the arguments advanced by the parties. Citing section 3 of the Credit Services Act (815 ILCS 605/3 (West 1996)), the Rogers maintain that Midstate is a credit services organization because Midstate agreed to help the Rogers obtain financing for the improvements to their home. Midstate counters that it provided a gratuitous service to the Rogers in forwarding their loan application to the financial institutions. Midstate maintains that, in enacting the Credit Services Act, the legislature did not intend to regulate the actions of retailers, such as Midstate, in facilitating the extension of credit to their customers. We agree with Midstate that the legislature did not intend to regulate the transaction at issue.

Section 3 of the Credit Services Act provides in part:

"(a) 'Buyer' means an individual who is solicited to purchase or who purchases the services of a credit services organization.

\* \* \*

(d) Credit Services Organization means a person who, with respect to the extension of credit by others and in return for the payment of money or other valuable consideration, provides, or represents that the person can or will provide, any of the following services:

(i) improving a buyer's credit record, history, or rating[;]

(ii) obtaining an extension of credit for a buyer; or

(iii) providing advice or assistance to a buyer with regard to either subsection (i) or (ii)." 815 ILCS 605/3(a), (d) (West 1996).

Looking to the definition of a "[b]uyer" and the definition of a "[c]redit [s]ervices [o]rganization," it is clear that the Credit Services Act regulates transactions involving the payment of money or other valuable consideration *in return* for the services of the credit services organization. In turn, the services of the credit

services organization are "improving a buyer's credit record, history, or rating"; "obtaining an extension of credit for a buyer"; or "providing advice or assistance to a buyer" with regard to "improving a buyer's credit record, history, or rating" or with regard to "obtaining an extension of credit" for the buyer. 815 ILCS 605/3 (West 1996). Thus, the Credit Services Act requires payment for credit services, not simply payment for other goods or services.

In the present case, the circuit court rejected Midstate's contention that there was inadequate consideration to support a contract for credit services. The circuit court observed:

> "In order to remain competitive, the Plaintiff offered a service to prospective buyers to assist them in obtaining financing to purchase siding and windows. In fact, the agreement between the Plaintiff and Defendant would never have been consummated had the Plaintiff not helped them obtain financing. The Plaintiff's assistance was more than a mere service, but was part of the consideration to support the agreement."

In this, the circuit court committed error. The Credit Services Act requires that the credit services organization, in return for the payment of money or other valuable consideration, agree to provide, or represent that it will provide, credit services to the buyer. The services must be related to an extension of credit for the buyer or improvement of the buyer's credit record, history or rating. The contract at issue does not provide for payment of money or other valuable consideration in return for credit services provided by Midstate. Instead, the agreed consideration is for payment of windows and siding to be installed at the Rogers' home. Although we agree with the circuit court that the Rogers would not have proceeded with the installation of the windows and siding without assistance in obtaining an extension of credit, the Credit Services Act requires additional consideration for such assistance.

Our reading of the statutory language is consistent with section 5 of the Act. That section provides:

"No *credit services organization* *** shall:
***

(2) Charge or receive any money or other valuable consideration solely for the referral of a buyer to a *retail seller* who will or may extend credit to the buyer if such extension of credit is in substantially the same terms as those available to the general public." (Emphases added.) 815 ILCS 605/5 (West 1996).

The section prohibits a credit services organization from charging a fee for referrals to a retail seller. The section also recognizes that a retail seller is an entity that may extend credit to a buyer. The major distinction between a credit services organization and a retail seller is that the credit services organization, in return for the payment of money or other valuable consideration, offers services to a buyer dedicated to improving the buyer's credit history or rating or to obtaining an extension of credit for the buyer.

Our interpretation of the statutory language is also consistent with the legislative findings and declarations set forth in the Act. Section 2 of the Credit Services Act (815 ILCS 605/2 (West 1996)) provides in part:

"(a) The ability to obtain and use credit has become of great importance to consumers who have a vital interest in establishing and maintaining their credit worthiness and credit standing. As a result, consumers who have experienced credit problems may seek assistance from credit service businesses which offer to improve the credit standing of such consumers. Certain advertising and business practices of some companies engaged in the business of credit services have worked a financial hardship upon the people of this State, often on those who are of limited economic means and inexperienced in credit matters.

(b) The purpose of this Act is to provide prospective consumers of credit services companies with the information necessary to make an informed decision regarding the purchase of those services and to protect the public from unfair or deceptive advertising and business practices."

The Credit Services Act is aimed at remedying problems encountered by consumers seeking to improve their credit history or rating, obtain more favorable terms on current debt, or obtain an extension of credit through services provided by credit services organizations. As such, the Credit Services Act prohibits credit services organizations from engaging in certain conduct (815 ILCS 605/5 (West 1996)) and requires that credit services organization make certain disclosures to the buyers (815 ILCS 605/6, 7 (West 1996)). The Credit Services Act is not intended to regulate retailers primarily engaged in the business of selling goods and services to their customers. The goods and services provided by retailers are not generally services aimed at improving the consumer's credit or obtaining an extension of credit for the consumer, otherwise unattainable because of the consumer's poor credit history or rating. See *Fogle v. William Chevrolet/Geo, Inc.*, No. 99—C—5960 (N.D. Ill. August 9, 2000) (mem. op.).

## CONCLUSION

For the aforementioned reasons, the judgments of the appellate court and circuit court are reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

*Appellate court judgment reversed;*
*circuit court judgment reversed;*
*cause remanded.*

JUSTICE RARICK took no part in the consideration or decision of this case.

JUSTICE KILBRIDE, dissenting:

The majority ignores the plain language of the Act and the undisputed facts of this case. The majority does not stop there. It also reads a requirement of "additional consideration" into the Act. 204 Ill. 2d at 322. Based on

these fundamental errors, the majority concludes that Midstate is not a "credit services organization." Because I cannot agree with that erroneous conclusion, I respectfully dissent.

Initially, the majority cites the statutory definition of a credit services organization, encompassing "a person who *** in return for the payment of money or other valuable consideration" either obtains "an extension of credit for a buyer; or *** provid[es] advice or assistance to a buyer with regard to" obtaining an extension of credit. (Emphasis added.) 815 ILCS 605/3(d)(ii), (d)(iii) (West 1996); 204 Ill. 2d at 321. The majority also notes that the statutory definition of a "[b]uyer" is one "who is solicited to purchase or who purchases the services of a credit services organization." 815 ILCS 605/3(a) (West 1996).

After briefly acknowledging these definitions, however, the majority does not consider their application in this case, choosing instead to conclude summarily that Midstate is not a credit services organization because "the Credit Services Act requires payment for credit services, not simply payment for other goods or services." 204 Ill. 2d at 322. This conclusion fails to analyze fully the key issue in this case, namely, whether Midstate's conduct brings it within the statutory definition of a credit services organization. The majority omits a fundamental analytical step by not applying the Act to the relevant facts underlying the parties' transaction. A complete analysis requires us to examine the undisputed facts in this case.

When the Midstate sales representative who met the Rogers in their home informed them of the total cost of the remodeling project, the Rogers explained that they had limited income and could not afford the project. Mr. Rogers is disabled, with a gross income of only $9,540 per year, and Mrs. Rogers works as a nurse, earning an annual gross income of $19,760. As the majority admits

(204 Ill. 2d at 322), the Rogers ultimately agreed to the contract *only* because Midstate offered its services to help them obtain third-party financing. The parties' agreement indicated no cash payments and stated that the contract amount of $19,600 was subject to a loan. It disclosed no information about the applicable interest rates or monthly payment amount.

Midstate concedes that it assisted the Rogers in securing a third-party loan. One of its sales representatives provided the Rogers with a credit application and directed them to complete it. The representative informed the couple that Midstate would obtain financing for them and that they would make monthly payments for approximately 15 years. Again, the representative failed to provide any information concerning the actual amount of the monthly payments.

After the representative's visit, a Midstate loan assistance employee reviewed the Rogers' credit application. The employee testified that Midstate assists customers with financing and that her job is to help qualify customers for loans. In this capacity, she reviews more than 50 credit applications each week. In this case, she received the Rogers' credit application, reviewed it, and then contacted a number of lending institutions on their behalf, forwarding their credit application in an effort to secure a loan. The first three institutions she contacted refused to extend credit to the Rogers. Eventually, Midstate secured a loan commitment from Bank One at a rate of 11.35%, adjustable monthly, but the Rogers found this interest rate unacceptable. The record contains no evidence that the Rogers *ever* independently met, or otherwise undertook loan negotiations, with *any* lending institution. Thus, Midstate acted as a *de facto* representative for the Rogers in obtaining the loan commitment, for the mutual benefit of both parties.

When we focus on the specific facts of the transaction

between the parties in this case, we must conclude that Midstate's actions went far beyond simply selling goods to the Rogers, as the majority claims. 204 Ill. 2d at 322. Midstate's conduct fulfilled two of the Act's key criteria, not only "providing advice or assistance to a buyer with regard to" "obtaining an extension of credit," but also actually *obtaining* an extension of credit for the Rogers. See 815 ILCS 605/3(d)(ii), (d)(iii) (West 1996). The trial court properly found Midstate's acts went beyond mere ancillary services performed in conjunction with a retail sale and fall squarely within the statutory definition of those provided by a "[c]redit services organization." See 815 ILCS 605/3(d)(ii), (d)(iii) (West 1996).

To determine whether Midstate itself was a credit service organization under the Act in this case, however, we must address two other, closely interrelated questions: (1) whether Midstate performed the credit services "in return for the payment of money *or other valuable consideration*" (emphasis added) (see 815 ILCS 605/3(d) (West 1996)) and (2) whether the Rogers were "buyers" under the statute, meaning that they either were "solicited to purchase" or actually purchased the services of a credit services organization (see 815 ILCS 605/3(a) (West 1996)).

In answering these questions, the majority abruptly concludes that "the agreed consideration is for payment of windows and siding" and is not "in return for credit services provided by Midstate." 204 Ill. 2d at 322. Based on that conclusion, the majority holds that Midstate is not a credit services organization. The majority's rationale is belied, however, by its subsequent statement agreeing "with the circuit court that the Rogers *would not have proceeded* with the installation of the windows and siding without assistance in obtaining an extension of credit." (Emphasis added.) 204 Ill. 2d at 322. The circuit court expressly found that

" '[i]n order to remain competitive, the Plaintiff [Midstate] offered a service to prospective buyers to assist them in obtaining financing to purchase siding and windows. In fact, *the agreement between the Plaintiff and Defendant would never have been consummated had the Plaintiff not helped them obtain financing. The Plaintiff's assistance* was more than a mere service, but *was part of the consideration to support the agreement.*' " (Emphases added.) See 204 Ill. 2d at 322.

Despite its stated agreement with this finding, the majority nonetheless declares that "the Credit Services Act requires *additional consideration* for such assistance." (Emphasis added.) 204 Ill. 2d at 322. This conclusion is unsupported by any language in the Act. Thus, the majority both overlooks the plain language of the statute and creates other requirements out of whole cloth, without any legal justification.

The majority cites section 5 of the Act as consistent with this conclusion, but the connection between the two concepts remains unexplained. Section 5 prohibits credit services organizations from receiving valuable consideration solely for referring buyers to retail sellers who may extend credit "if such extension of credit is in substantially the same terms as those available to the general public." 815 ILCS 605/5 (West 1996). First, there is nothing in the record to suggest that this case meets the criteria in section 5. Indeed, the record strongly suggests the opposite conclusion, *i.e.*, the Rogers *would not* have been able to obtain the necessary financing *"in substantially the same terms as those available to the general public."* Thus, section 5 is not implicated in this case.

Even more importantly, section 5 appears completely unrelated to the majority's finding that "the Credit Services Act requires additional consideration" for Midstate's assistance in obtaining financing for the Rogers. 204 Ill. 2d at 322. As the majority aptly notes (204 Ill. 2d at 320), we must not depart from a statute's plain language by reading into it exceptions, limitations, or

conditions not clearly intended by the legislature. See *Bridgestone/Firestone, Inc. v. Aldridge*, 179 Ill. 2d 141, 149 (1997). Yet, the majority departs from this same fundamental rule of construction by reading into the Act a requirement that an agreement to assist another in obtaining third-party financing be accompanied by some form of "additional consideration." See 204 Ill. 2d at 322. The majority does not, and cannot, point to any language in the Act supporting this limitation.

Contrary to the majority's rationale, to bring a credit services organization within the ambit of the Act does not require any additional *monetary* payment for performing the credit-related services. The Act expressly requires only that the services be provided "in return for the payment of *money or other valuable consideration*." (Emphasis added.) 815 ILCS 605/3(d) (West 1996).

Here, Midstate induced the Rogers to enter into the remodeling project by offering to arrange a loan for them, and it subsequently fulfilled this promise. As the majority admits, the Rogers' agreement to proceed with the contract was strictly contingent on Midstate's proffered assistance in obtaining credit. 204 Ill. 2d at 322. By expressly agreeing with the trial court's finding that "the Rogers would not have proceeded" with the contract without Midstate's substantial assistance in obtaining the requisite financing (204 Ill. 2d at 322), the majority also implicitly acknowledges that Midstate's credit assistance was in fact supported by "other valuable consideration" (see 815 ILCS 605/3(d) (West 1996)), *i.e.*, the Rogers' ultimate agreement to enter into the remodeling contract. This acknowledgment contradicts the majority's conclusion that Midstate's credit services were gratuitous and not supported by "additional consideration" (204 Ill. 2d at 322). As the majority admits, Midstate's assistance constituted an integral part of the parties' contract, received in exchange for valuable consideration.

By giving "other valuable consideration" for Midstate's proffered credit services, in addition to the promise of monetary payment for windows and siding as noted by the majority (204 Ill. 2d at 322), the Rogers were "buyers" under the Act. 815 ILCS 605/3(a) (West 1996) (defining a "[b]uyer" as one "who is solicited to purchase *** the services of a credit services organization). Under these facts, Midstate clearly falls within the statutory definition of a "credit services organization," with the Rogers acting as "buyers" of that organization's credit services. See 815 ILCS 605/3(a), (d) (West 1996). Therefore, the parties agreed to the provision of credit services "in return for the payment of *** other valuable consideration" (815 ILCS 605/3(d) (West 1996)), and their transaction was governed by the Act.

Holding that Midstate's conduct in this case qualified it as a credit services organization is consistent with the Act's stated goal of providing "prospective consumers of credit services companies with the information necessary to make an informed decision regarding the purchase of those services and to protect the public from unfair or deceptive advertising and business practices." 815 ILCS 605/2(b) (West 1996). These protections were prompted by "[c]ertain advertising and business practices of some companies engaged in the business of credit services [that] have worked a financial hardship upon the people of this State, often on those who are of limited economic means and inexperienced in credit matters." 815 ILCS 605/2(a) (West 1996). As prospective consumers of Midstate's credit services, the Rogers were entitled to these protections.

As a credit services organization, Midstate was bound by the statutory mandates contained in sections 6 and 7 of the Act (815 ILCS 605/6, 7 (West 1996)). Since the parties' contract failed to comply with the mandatory terms of the statute, including the requirement of full

disclosure of "the terms and conditions of payment, including the total of all payments to be made by the buyer" (815 ILCS 605/7 (West 1996)), it violated the statute. "Any contract for services which does not comply with applicable provisions of [the Act] shall be void and unenforceable as contrary to public policy." 815 ILCS 605/8 (West 1996).

For this reason, the trial court and the appellate court properly deemed the contract void and awarded the Rogers attorney fees under section 11 of the Act (815 ILCS 605/11 (West 1996)). I would affirm the appellate court on this issue and remand the cause to the trial court with instructions to award reasonable attorney fees in favor of the Rogers.

I also believe the trial court's ruling could be affirmed on the alternative basis that the contract violated the Consumer Fraud and Deceptive Business Practices Act (Fraud Act) (815 ILCS 505/1 *et seq.* (West 1996)). The Rogers raised this issue in their counterclaim, but the trial and appellate courts did not address it. The Fraud Act provides that "the use or employment of any *** misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon" it constitutes an "[u]nfair method[ ] of competition and unfair or deceptive act[ ] or practice[ ]." 815 ILCS 505/2 (West 1996). Such conduct is unlawful regardless of "whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2 (West 1996). In this case, the contractual interest rate was undoubtedly a material fact, but it was not disclosed when the Rogers entered into the agreement with Midstate. Because Midstate omitted the applicable interest rate from the contract, it violated the Fraud Act. For this reason, I would affirm the award of attorney fees to the Rogers pursuant to section 10a(c) of the Fraud Act (815 ILCS 505/10a(c) (West 1996)).