**2017 IL 122046**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 122046)

*In re* MARRIAGE OF CHRISTINE GOESEL, Appellant, and
ANDREW GOESEL (Laura A. Holwell, Appellee).

*Opinion filed November 30, 2017.*

JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Freeman, Kilbride, Garman, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1      At issue is whether fees that have already been earned by an attorney in a dissolution of marriage proceeding are considered "available funds," such that they may be disgorged under section 501(c-1)(3) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/501(c-1)(3) (West 2014)). We hold that earned fees are not subject to disgorgement.

BACKGROUND

¶ 3        The facts of this case are set forth fully in the appellate court's opinion. 2017 IL App (3d) 150101, ¶¶ 3-10. We set forth here only those facts necessary to an understanding of the specific question of law that we decide today. On January 18, 2013, petitioner, Christine Goesel, filed a petition for dissolution of marriage from respondent, Andrew Goesel. Christine was originally represented by Goldstine, Skrodzki, Russian, Nemec and Hoff, Ltd. (Goldstine), and Andrew was represented by Janice Boback of Anderson & Boback, LLC. On October 10, 2013, contemnor Laura Holwell filed her appearance as Andrew's counsel, and the trial court granted Boback leave to withdraw. Before withdrawing, Boback had moved to disqualify Goldstine. The disqualification motion alleged that Goldstine had improperly ordered Christine to provide it with Andrew's mail that arrived at the marital home and that Goldstine had opened and viewed the mail. The trial court ultimately disqualified Goldstine, and Holwell billed Andrew $37,094.49 for her work on the disqualification matter.

¶ 4        On March 10, 2014, the Law Offices of Edward R. Jaquays (Jaquays) appeared on behalf of Christine, and on June 6, 2014, Howard LeVine of LeVine, Wittenberg, Shugan, and Schatz, Ltd., appeared on behalf of Andrew. On June 12, 2014, Christine filed a petition for interim attorney fees, which she amended on June 20, 2014. In the amended petition, Christine stated that she had paid Jaquays an initial retainer of $5000 and had an outstanding balance with him of $27,142.60. She argued that she lacked sufficient funds to pay any additional fees beyond the retainer, and she requested that the court, pursuant to the "leveling of the playing field" rules of the Act, order Andrew to pay her fees. Alternatively, if the court determined that Andrew lacked the ability to pay her attorney fees, Christine requested that the court order disgorgement of the necessary amount from the money that Andrew had already paid to Holwell. Andrew also filed a petition for prospective attorney fees, contending that, although he was employed, he did not have sufficient funds to pay his attorney fees. On June 20, 2014, Holwell moved to withdraw as Andrew's counsel. The court granted the motion but retained jurisdiction over Holwell pending resolution of the disgorgement issue.

¶ 5        At the hearing on the petition for interim attorney fees, the parties stipulated to the attorneys' rates and that the work performed by the attorneys was reasonable

and necessary. Copies of invoices entered into evidence at the hearing showed that all of the money Holwell had received was for work already performed. Andrew still owed $17,500.38 to Holwell and $26,000 to LeVine. Additionally, Holwell testified that she was holding $13,000 that Andrew had previously paid to Boback and that Boback had then paid to Holwell, as there was a dispute as to who owned the money.

¶ 6        On September 29, 2014, the court entered an order finding that both parties lacked an ability to pay reasonable attorney fees. The court found that the total attorney fees paid by Andrew were $100,022.27, with $66,382.28 going to Holwell, $10,000 to LeVine, and $23,639.99 to Boback. Christine had paid her attorneys $18,117.04, with $5000 going to Jaquays and $13,117.04 going to Goldstine. The court thus found that $118,139.31 had been paid to date, and to "level the playing field," each party should have $59,069.65 for attorney fees. In order to achieve parity, the court found that it was necessary to order Holwell to disgorge $40,952.61. Accordingly, the court ordered Holwell to tender $40,952.61 in fees to Jaquays with 14 days.

¶ 7        After more than 14 days had passed and Holwell had not turned over the funds, Christine moved to have Holwell held in indirect civil contempt. Holwell requested to be held in friendly contempt of court so that she could appeal pursuant to Illinois Supreme Court Rule 304(b)(5) (eff. Feb. 26, 2010). On December 18, 2014, the court entered an order finding Holwell in friendly contempt of court. Christine later filed a motion to clarify the court's contempt finding. Christine pointed out that, pursuant to Rule 304(b)(5), only contempt orders that impose a penalty are immediately appealable. Accordingly, Christine asked the court to impose a monetary or other penalty on Holwell. At the hearing on Christine's motion, Holwell explained to the court that she was not willfully disobeying its order but that she did not have $40,000 to turn over. The court subsequently vacated its December 18, 2014, finding of friendly contempt, held Holwell in indirect civil contempt, charged her with a $10 per day penalty for each day that she did not pay the disgorgement, and sentenced her to an indeterminate amount of time in the Will County adult detention facility, not to exceed 179 days. The court stayed Holwell's sentence for 30 days to give her time to file an appeal. The court stated that Holwell could purge herself of the contempt order by paying $40,952.61 to Jaquays by January 21, 2015. At a hearing on January 21, 2015, Holwell reiterated to the court

that she did not have the money but explained that she was making arrangements to borrow it. The court reaffirmed its contempt finding and penalty, and Holwell appealed to the Appellate Court, Third District.

¶ 8        Holwell raised several issues on appeal. Holwell argued that the trial court erred in (1) ordering disgorgement without making a specific finding that Christine lacked the ability to pay, (2) finding that the disgorgement order was a judgment because disgorgement orders are temporary advances against the marital estate, and (3) holding Holwell in indirect civil contempt without notice and a hearing and without inquiring into Holwell's ability to pay. After the Appellate Court, First District, issued its opinion in *In re Marriage of Altman*, 2016 IL App (1st) 143076, which held that earned fees are not subject to disgorgement, Holwell filed a supplemental brief arguing that the court's disgorgement order was in error because the entirety of the $40,952.61 ordered disgorged was for fees that had already been earned.

¶ 9        The appellate court reversed the disgorgement order. The court first held that, contrary to Holwell's claim, the trial court had made a specific finding that neither party had the ability to pay attorney fees. 2017 IL App (3d) 150101, ¶ 15. The court then reviewed the evidence from the hearing on attorney fees and concluded that the court had not abused its discretion in determining that neither party had the ability to pay. *Id.* ¶¶ 18-21. The court agreed with Holwell, however, that the court had erred in ordering disgorgement of fees that were paid to Holwell for services already rendered. The court determined that the relevant question is what the word "available" means in section 501(c-1)(3), when it states that trial courts may "enter an order that allocates available funds for each party's counsel, including retainers or interim payments, or both, previously paid" (750 ILCS 5/501(c-1)(3) (West 2014)). 2017 IL App (3d) 150101, ¶ 25. The court noted that there was a split in the appellate court on this issue. *Id.* ¶ 31. In *In re Marriage of Squire*, 2015 IL App (2d) 150271, the Second District held that retainers or interim payments may be disgorged whether or not they had been earned by the attorney. According to the Second District, "available" in section 501(c-1)(3) simply means that the funds "exist somewhere." *Id.* ¶ 22. The First District rejected this view in *Altman*, 2016 IL App (1st) 143076. According to the First District, "available" should be construed to mean those funds that have not yet been earned. *Id.* ¶ 36. In the case before us, the Third District determined that *Altman* expressed the correct

interpretation of section 501(c-1)(3). 2017 IL App (3d) 150101, ¶ 31. Accordingly, since the parties had stipulated that Holwell's fees were reasonable and necessary, and there was no question that the fees that the court ordered disgorged had all been earned by Holwell, the appellate court held that the trial court's disgorgement order must be reversed. *Id.* ¶ 34. Because it held the disgorgement order invalid, the court reversed the contempt finding against Holwell. *Id.* ¶ 36.

¶ 10       This court allowed Christine's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Mar. 15, 2016). This court also allowed the Illinois State Bar Association and the Illinois Chapter of the American Academy of Matrimonial Lawyers to file a joint brief *amici curiae* in support of Holwell.

¶ 11                                    ANALYSIS

¶ 12       Christine raises two issues on appeal. First, Christine argues that the appellate court erred in holding that earned fees are not available for disgorgement under the Act. Second, Christine contends that the appellate court erred in vacating the contempt finding against Holwell. According to Christine, Holwell was not engaging in a good-faith attempt to appeal the trial court's contempt finding. The second issue was not raised in Christine's petition for leave to appeal and is thus forfeited. See *Crossroads Ford Truck Sales, Inc. v. Sterling Truck Corp.*, 2011 IL 111611, ¶ 62. Accordingly, we will confine our analysis to whether the disgorgement order was proper.[1]

¶ 13       The issue before us is one of statutory construction, and the principles guiding our review are familiar. The primary goal of statutory construction, to which all other rules are subordinate, is to ascertain and give effect to the intention of the legislature. *Jackson v. Board of Election Commissioners*, 2012 IL 111928, ¶ 48. The best indication of legislative intent is the statutory language, which must be given its plain and ordinary meaning. *Metropolitan Life Insurance Co. v. Hamer*,

---

[1]As an alternative basis for affirming the appellate court's judgment, Holwell argues that the trial court abused its discretion in finding that neither party had the ability to pay attorney fees. However, given that we allowed the petition for leave to appeal to resolve the conflict in the appellate court over whether earned fees are subject to disgorgement, and we agree with Holwell that her earned fees were not subject to disgorgement, we see no need to address this issue.

2013 IL 114234, ¶ 18. It is improper for a court to depart from the plain statutory language by reading into the statute exceptions, limitations, or conditions that conflict with the clearly expressed legislative intent. *Id.* Words and phrases should not be viewed in isolation but should be considered in light of other relevant provisions of the statute. *Midstate Siding & Window Co. v. Rogers*, 204 Ill. 2d 314, 320 (2003). Further, each word, clause, and sentence of a statute must be given a reasonable construction, if possible, and should not be rendered superfluous. *Prazen v. Shoop*, 2013 IL 115035, ¶ 21. Where statutory language is clear and unambiguous, it will be given effect without resort to other aids of construction. *Kunkel v. Walton*, 179 Ill. 2d 519, 534 (1997). If the meaning of an enactment is unclear from the statutory language, the court may consider the purpose behind the law and the evils the law was designed to remedy. *Gruszeczka v. Illinois Workers' Compensation Comm'n*, 2013 IL 114212, ¶ 12. A statute is ambiguous when it is capable of being understood by reasonably well-informed persons in two or more different senses. *Solon v. Midwest Medical Records Ass'n*, 236 Ill. 2d 433, 440 (2010). In determining legislative intent, we may also consider the consequences that would result from construing the statute one way or the other, and in doing so, we presume that the legislature did not intend absurd, inconvenient, or unjust consequences. *Id.* at 441. Our review is *de novo*. *In re Marriage of Heroy*, 2017 IL 120205, ¶ 13.

¶ 14 The relevant statute—section 501(c-1)(3) of the Marriage and Dissolution of Marriage Act—was enacted as part of the "leveling of the playing field amendments," which became effective on June 1, 1997. See *In re Marriage of Earlywine*, 2013 IL 114779, ¶ 21. This section provides as follows:

"In any proceeding under this subsection (c-1), the court (or hearing officer) shall assess an interim award against an opposing party in an amount necessary to enable the petitioning party to participate adequately in the litigation, upon findings that the party from whom attorney's fees and costs are sought has the financial ability to pay reasonable amounts and that the party seeking attorney's fees and costs lacks sufficient access to assets or income to pay reasonable amounts. In determining an award, the court shall consider whether adequate participation in the litigation requires expenditure of more fees and costs for a party that is not in control of assets or relevant information. Except for good cause shown, an interim award shall not be less than payments made or

- 6 -

reasonably expected to be made to the counsel for the other party. If the court finds that both parties lack financial ability or access to assets or income for reasonable attorney's fees and costs, the court (or hearing officer) shall enter an order that allocates available funds for each party's counsel, including retainers or interim payments, or both, previously paid, in a manner that achieves substantial parity between the parties." 750 ILCS 5/501(c-1)(3) (West 2014).

The statute does not use the term "disgorgement." The term was adopted by courts to describe the process whereby a court orders an attorney to turn over previously paid interim fees or retainers. As this court explained in *Earlywine*, the purpose of the "leveling of the playing field" amendments was to " 'equaliz[e] the parties' litigation resources where it is shown that one party can pay and the other cannot.' " *Earlywine*, 2013 IL 114779, ¶ 26 (quoting *In re Marriage of Beyer*, 324 Ill. App. 3d 305, 315 (2001)). The legislature was addressing the problem of one party using his or her greater control of assets as a tool, making it more difficult for the disadvantaged spouse to participate equally in the litigation. *Id.*

¶ 15 We discuss first this court's decision in *Earlywine*. The Second District in *Squire* believed that *Earlywine* settles the question before the court, while the First and Third Districts did not believe that *Earlywine* spoke to it. Thus, we will first consider whether *Earlywine* settles this question because, if so, we need go no further. In *Earlywine*, this court considered whether an advance payment retainer was subject to disgorgement under section 501(c-1)(3). In that case, the petitioner husband had paid his attorney by way of an advance payment retainer. Upon finding that neither party had the ability to pay attorney fees, the trial court ordered that $4000 be disgorged from the husband's attorney, Thomas James. *Id.* ¶ 5. James then asked to be held in friendly contempt. *Id.* ¶ 9. The court agreed, held James in friendly contempt, and fined him $50. *Id.* James appealed, contending that advance payment retainers are not subject to disgorgement because they become the property of the attorney upon payment. The appellate court affirmed, explaining that (1) section 501(c-1)(3) simply used the term "retainers" and did not limit the type of retainers to which it applied and (2) allowing a party to avoid disgorgement through the use of an advance payment retainer would defeat the purpose of the leveling of the playing field amendments. *Id.* ¶ 10. This court affirmed the appellate court.

¶ 16    This court first discussed the different types of retainers that are allowed in Illinois. The first is the "general" retainer, which is paid to secure a lawyer's availability during a specified time or for a specified matter. It becomes the lawyer's property upon payment. *Id.* ¶ 15. The second type is the security retainer. A security retainer is held in a client trust account and remains the property of the client until the attorney applies it to charges for services rendered. *Id.* The third type of retainer is the advance payment retainer, which was first recognized by this court in *Dowling v. Chicago Options Associates, Inc.*, 226 Ill. 2d 277 (2007). *Earlywine*, 2013 IL 114779, ¶ 15. This type of retainer is a present payment for a commitment to provide legal services in the future. *Id.* ¶ 16. Unlike a security retainer, the funds become the attorney's property immediately upon payment and must be deposited in the lawyer's general account. *Id.* As with a security retainer, however, the lawyer has an ethical obligation to refund to the client any portion of the retainer that is neither earned nor required for expenses. Ill. R. Prof'l Conduct (2010) R. 1.15(c)(4) (eff. Jan. 1, 2010). *Earlywine* noted that *Dowling* had explained that advance payment retainers should be used sparingly and only to accomplish a purpose that cannot be accomplished with a security retainer. *Earlywine*, 2013 IL 114779, ¶ 17. *Dowling* had explained that examples of the appropriate use of an advance payment retainer are those situations in which a client may have trouble hiring counsel unless he can shield the attorney fees from claims by his or her creditors. *Id.* ¶ 18. A security retainer leaves funds in the client's name, thus subjecting them to claims by creditors. Examples of appropriate situations for an advance payment retainer would be those of "a debtor [who] hired counsel to represent him in proceedings against a judgment creditor; a criminal defendant whose property remains subject to forfeiture; and a debtor in a bankruptcy case." *Id.* In *Earlywine*, James argued that similar policy concerns should allow parties in dissolution proceedings to shield attorney fees from being turned over to opposing counsel. *Id.* ¶ 20. This court disagreed.

¶ 17    First, this court noted that section 501(c-1) used the general word "retainers" and did not place any qualifications on the types of retainers that could be disgorged. *Id.* ¶ 25. This court then considered the policy underlying the leveling of the playing field amendments. This court explained that allowing advance payment retainers to be used in the manner suggested by James would undermine the purpose of the amendments. *Id.* ¶ 27. It was obvious that the retainer in *Earlywine* was set up specifically to circumvent the leveling of the playing field rules. *Id.*

Accepting James's argument would have meant that avoiding the application of the rules was as simple as putting the funds in an advance payment retainer. *Id.* Thus, the rules would no longer prevent an economically advantaged spouse from gaining an unfair advantage over the other spouse. *Id.* The policy concerns expressed in *Dowling* are simply not present in dissolution cases. *Id.* ¶ 28. Thus, this court held that advance payment retainers must be subject to disgorgement in order to avoid "defeat[ing] the express purpose of the Act and render[ing] the 'leveling of the playing field' provisions powerless." *Id.* ¶ 29.

¶ 18    As noted, the Second District in *Squire* believed that *Earlywine* largely settled the question before the court by holding that advance payment retainers are subject to disgorgement. *Squire*, 2015 IL App (2d) 150271, ¶ 22. Advance payment retainers become the property of the attorney upon payment, and therefore a trial court can order an attorney to disgorge funds that belong to him or her. *Id.* Earned fees are also the property of the attorney, and therefore, pursuant to *Earlywine*, they may also be disgorged. *Id.* We do not believe that the issue is that simple. First, the main takeaway from *Earlywine* is that advance payment retainers should not be used in dissolution cases when the purpose of the retainer is to block the other spouse's access to funds for attorney fees. As this court explained, advance payment retainers are appropriate only in special circumstances, and circumventing the leveling of the playing field rules and blocking the other spouse's access to funds for attorney fees are not the special circumstances that this court had in mind. *Earlywine*, 2013 IL 114779, ¶¶ 27-29. Second, although *Earlywine* stands for the general proposition that an advance payment retainer is subject to disgorgement, there was no argument or discussion in that case about what portion of the retainer had been earned. As the appellate court pointed out, although an advance payment retainer becomes the property of the attorney upon payment, the attorney still has to earn the retainer and must refund any unearned portion to the client. 2017 IL App (3d) 150101, ¶¶ 28-30. No issue was raised in *Earlywine* regarding what portion of the advance payment retainer was earned. Rather, *Earlywine* merely addressed the general question of whether section 501(c-1)(3)'s reference to retainers includes advance payment retainers. Thus, we do not believe that *Earlywine* answers the question before the court today.

¶ 19    The first court to consider the precise issue of whether earned fees are subject to disgorgement was the Second District in *Squire*, 2015 IL App (2d) 150271. In that

case, the petitioner husband filed a petition for dissolution of marriage in 2013 and, in June 2014, petitioned for interim and prospective attorney fees. *Id.* ¶ 2. The petitioner alleged that he lacked funds to pay his attorney fees, while the respondent had access to significant funds to pay her lawyers. *Id.* By the time of the hearing on contribution, the petitioner had paid his attorneys $2500, but owed them approximately $53,000. *Id.* ¶ 3. The respondent was unemployed but had borrowed approximately $130,000 from her mother to pay her attorneys. Approximately $10,000 of this amount went to her previous attorney, and the rest was paid to her current attorneys (the Stogsdill Law Firm (Stogsdill)) as a retainer. *Id.* ¶ 4. Stogsdill argued that it had already earned the entire retainer and deposited it in its general account and thus it was not subject to disgorgement. *Id.* ¶ 5. The court granted the interim fee petition. The court ordered Stogsdill to pay petitioner's counsel $60,000 within 14 days. *Id.* ¶ 6. The court explained that, pursuant to this court's decision in *Earlywine*, 2013 IL 114779, it did not matter that the retainer had already become Stogsdill's property. *Squire*, 2015 IL App (2d) 150271, ¶ 6. The trial court held Stogsdill in friendly contempt of court, ordered it to pay the $60,000 by March 19, 2015, and imposed a fine of $100 per day for each day that Stogsdill refused to pay. *Id.* ¶ 7.

¶ 20      On appeal, Stogsdill argued that it could not be required to turn over fees that it had already earned. Section 501(c-1)(3) refers to "available" funds being subject to disgorgement, and Stogsdill argued that funds that have been earned by the attorney and have become the attorney's property are no longer "available." *Id.* ¶ 9. The appellate court rejected Stogsdill's argument. The court's decision was based largely on this court's decision in *Earlywine*, which held that advance payment retainers are subject to disgorgement. The court noted that an advance payment retainer, in contrast to a security retainer, becomes the attorney's property upon payment and is to be deposited in the attorney's general account. *Id.* ¶¶ 17, 22. Thus, it could not be correct that funds that are the property of the attorney are not subject to disgorgement. *Id.* ¶ 22. The court also believed that Stogsdill's position would frustrate the purposes of the statute because an attorney could block the other side's access to fees by filing voluminous pleadings and motions early in the case, thus earning the retainer, while leaving the other spouse with insufficient funds to respond properly. *Id.* ¶ 21. Accordingly, the Second District concluded that the word "available" in section 501(c-1)(3) must simply mean that the funds "exist somewhere." *Id.* ¶ 22.

¶ 21     In *Altman*, the First District rejected the Second District's interpretation. In that case, the wife petitioned for a dissolution of marriage. *Altman*, 2016 IL App (1st) 143076, ¶ 2. She was represented by Bradford & Gordon, LLC (Bradford). *Id.* ¶ 3. The respondent husband was initially represented by Scott Tzinberg, who was eventually granted leave to withdraw. *Id.* Tzinberg was replaced by Stephen Gerage, who also later withdrew from the case. *Id.* Following Gerage's withdrawal, the respondent proceeded *pro se*. *Id.* Nine months into the litigation, the petitioner sought interim attorney fees of $36,864.30 for fees already incurred and $25,000 for prospective fees and costs. *Id.* ¶ 8. By the time that the petitioner later filed an amended petition for fees, she alleged that she had incurred fees of $63,598.68 and had paid only $9500. *Id.* Thus, she still owed her attorneys $54,098.68. *Id.* The petitioner requested that the respondent pay her fees or, in the alternative, that the court order Gerage to disgorge sums that he had been previously paid. *Id.*

¶ 22     Following a hearing, the trial court determined that neither party had sufficient access to assets or income to pay attorney fees and that the leveling of the playing field provisions of the Act should be applied. *Id.* ¶ 10. As part of its order allocating funds for attorney fees, the court found that it would be necessary to order Gerage to disgorge $16,000 in fees that he had earned and that this amount needed to be turned over to Bradford within seven days. *Id.* Gerage failed to turn the money over, was held in contempt of court, and appealed. *Id.* ¶ 11.

¶ 23     On appeal, Gerage argued, *inter alia*, that the disgorgement order was improper because he had earned the funds and deposited them into his general operating account. Gerage argued that the legislature's use of the term "available" in section 501(c-1)(3) must mean that some funds are "unavailable" and this should include funds that an attorney has earned. *Id.* ¶ 27. The First District reviewed the Second District's decision in *Squire* and stated that, if "leveling the playing field" were the only consideration, it would be inclined to agree with *Squire*. *Id.* ¶ 33. Nevertheless, the court held that it could not ignore the legislature's use of the word "available" and that it would be a "tortured reading of the statute to say that even though the firm has earned the fees, paid itself (as it was entitled to do), and used that income to pay salaries, overhead, and litigation expenses for items such as experts and court reporters, it can nonetheless be required to refund those fees, not to its client, but to a third party." *Id.* The court noted that *Squire* had not discussed the significant policy concerns in holding that earned fees are subject to

disgorgement. *Id.* ¶ 34. The court believed that small firms and solo practitioners could face significant financial hardships when attempting to comply with disgorgement orders, particularly when the fees have been earned over several months and transferred in and out of their operating accounts. *Id.* The court noted that such concerns were exacerbated in cases such as the one before it where a party delays filing the fee petition. *Id.* The court further noted that, logically, the *Squire* interpretation means that a lawyer who had withdrawn from the case could be called upon months or even years later to write a check to the opposing party's counsel, as the funds still "exist somewhere." *Id.* ¶ 35. The court stated that it would not construe the statute as allowing such absurd results. *Id.* The court acknowledged that it was addressing interim fee awards and that accounts may be "trued up" when a final dissolution judgment is entered. *Id.* ¶ 36. However, the court explained that, because disgorgement is ordered upon a finding that neither party is able to pay attorney fees, it is not realistic to assume that the attorneys will ever be paid. *Id.* The court did not believe that the legislature intended that the "financial burden of leveling the playing field should be borne, in substantial part, by lawyers who must refund, under pain of contempt, fees they have earned." *Id.* The court thus reversed both the trial court's order and the contempt order. *Id.*

¶ 24    In the present case, the Third District considered the interpretations set forth in *Squire* and *Altman* and determined that *Altman* was correct. 2017 IL App (3d) 150101, ¶ 31. The court held that "the most reasonable interpretation of the term 'available funds,' as that term relates to previously paid 'retainers or interim payments' to an attorney as used in section 501(c-1)(3) of the Act, are those funds that are currently being held for a client that have not yet been earned by the attorney at the time the attorney is given notice of the petition for interim attorney fees and would be 'available' to be returned to the client if the attorney were to immediately cease services." *Id.* ¶ 25. The court did not believe that this court's decision in *Earlywine*, which held that advance payment retainers are subject to disgorgement, answered the question before the court. The court explained that, even though an advance payment retainer becomes the property of the attorney upon receipt, the attorney still has an obligation to refund to the client any unearned portion of the retainer. *Id.* ¶ 28. The court noted that the *Squire* court had failed to discuss an attorney's obligation to refund any unearned portion of an advance payment retainer to the client. *Id.* ¶ 32. As noted in the quoted passage above, however, the Third District added a wrinkle to the test adopted by *Altman*. *Altman*

held that earned fees were not subject to disgorgement, whereas here the Third District held that only fees that had been earned prior to the filing of the petition for interim fees were exempt from disgorgement. *Id.* ¶¶ 23, 25, 34. The court adopted this position by analogy to section 510(a) of the Act (750 ILCS 5/510(a) (West 2014)), which provides that judgments regarding maintenance or support obligations may be modified only as to "installments accruing subsequent to due notice by the moving party of the filing of the motion for modification." (Internal quotation marks omitted.) 2017 IL App (3d) 150101, ¶ 23. The court ultimately determined that, because all of Holwell's fees were earned prior to her receiving notice of the petition for interim fees, there were no funds available to be disgorged. *Id.* ¶ 34. Accordingly, the court reversed both the trial court's disgorgement order and its contempt order. *Id.* ¶¶ 34, 36.

¶ 25        We agree with the appellate court that the relevant question is what it means for funds to be "available" under section 501(c-1)(3). The legislature did not merely say that retainers and interim payments were subject to disgorgement. Rather, it stated that those funds must also be "available." As the appellate court has noted, this implies that some funds are "unavailable." *Id.* ¶ 25; *Altman*, 2016 IL App (1st) 143076, ¶ 33. We must give each word in the statute a reasonable construction, if possible, and no word should be rendered superfluous. *Prazen*, 2013 IL 115035, ¶ 21. The legislature could have easily said that all funds that had been paid to an attorney are subject to disgorgement, but the legislature instead chose to use the modifier "available."

¶ 26        "Available" means "such as may be availed of: capable of use for the accomplishment of a purpose: immediately utilizable" or "that is accessible or may be obtained: personally obtainable." Webster's Third New International Dictionary 150 (1993). As used in section 501(c-1)(3), the appellate court has defined "available funds" three different ways. In *Squire*, the Second District determined that it meant simply that the funds "exist somewhere." *Squire*, 2015 IL App (2d) 150271, ¶ 22. In *Altman*, the First District concluded that only funds that have not yet been earned by the attorney are "available": "funds earned by and paid to a party's lawyer in the normal course of representation for past services rendered are not 'available funds' within the meaning of section 501(c-1)(3)." *Altman*, 2016 IL App (1st) 143076, ¶ 36. Finally, in the present case, the Third District held that "available funds" are "those funds that are currently being held for a client that

have not yet been earned by the attorney at the time the attorney is given notice of the petition for interim attorney fees and would be 'available' to be returned to the client if the attorney were to immediately cease services." 2017 IL App (3d) 150101, ¶ 25.

¶ 27    For several reasons, we believe that *Altman* represents the correct interpretation. For one thing, it is consistent with the plain meaning of the term "available." It is difficult to see how an interim payment or retainer that has been earned by the attorney is nevertheless "available." Once an attorney has used up a retainer, there is clearly no longer an available retainer. Indeed, there is no longer even a retainer. If there is no retainer "available" as between the attorney and the client, it is difficult to see how one can be available to third parties. Christine relies on the statute's inclusion of "interim payments," and Christine contends that a "payment" is the discharge of a debt or liability by the delivery or money or other value. Thus, Christine suggests that an "interim payment" will always be for an amount that the lawyer has already earned. "Payment," however, can also mean more generally "the act of paying or giving compensation." Webster's Third New International Dictionary 1659 (1993). The statute defines "interim attorney's fees and costs" as including "reasonable fees and costs either already incurred *or to be incurred*." (Emphasis added.) 750 ILCS 5/501(c-1) (West 2014). Moreover, the phrase "previously paid" in section 501(c-1)(3) also modifies the term "retainers," which means that the legislature is clearly using the term "paid" as including sums that the attorney has not yet earned.

¶ 28    We acknowledge that, when the meaning of a legislative enactment is unclear, the court may consider the purpose behind the law and the evils the law was designed to remedy. *Gruszeczka*, 2013 IL 114212, ¶ 12. As we set forth above, the purpose of the "leveling of the playing field" amendments was to " 'equaliz[e] the parties' litigation resources where it is shown that one party can pay and the other cannot.' " *Earlywine*, 2013 IL 114779, ¶ 26 (quoting *Beyer*, 324 Ill. App. 3d at 315). If this were the only consideration, we would be inclined to hold that all retainers and interim payments were subject to disgorgement, regardless of whether they had been earned by the attorney. It will obviously be much easier for the trial court to equalize the parties' position if the entire amount of all interim payments and retainers is considered available.

¶ 29          Nevertheless, we must also consider the consequences that would result from construing the statute one way or the other, and in doing so, we presume that the legislature did not intend absurd, inconvenient, or unjust consequences. *Solon*, 236 Ill. 2d at 441. As the First and Third Districts have noted, the consequences of holding that earned fees are subject to disgorgement can be severe, and such a holding could very easily lead to absurd, inconvenient, and unjust consequences. We must presume that this was not the legislature's intent. As the appellate court explained in *Altman*:

> "It is not speculation to predict that some lawyers, particularly solo practitioners and those in small law firms, may be unable to comply with orders to disgorge funds that they have earned over several months and that have been transferred into (and out of) their operating accounts, at least not without serious financial hardship." *Altman*, 2016 IL App (1st) 143076, ¶ 34.

The court further noted that lawyers who have already been granted leave to withdraw from the case could be called upon months or years later to write a check to opposing party's counsel. *Id.* ¶ 35. In the present case, the Third District cited with approval *Altman*'s statement that it was not the legislature's intent that " 'the financial burden of leveling the playing field should be borne, in substantial part, by lawyers who must refund, under pain of contempt, fees they have earned.' " 2017 IL App (3d) 150101, ¶ 33 (quoting *Altman*, 2016 IL App (1st) 143076, ¶ 36). As Holwell has argued, if this court were to hold that earned fees are subject to disgorgement, then "Illinois attorneys must question whether they should utilize the fees they have rightfully earned to run their businesses, or hoard the funds for fear of disgorgement and place their businesses at risk."

¶ 30          *Amici* have identified further policy concerns that would arise if earned fees were subject to disgorgement. First, it would mean that Illinois divorce lawyers pay themselves at their own risk. Illinois Rule of Professional Conduct 1.15(c) (eff. July 1, 2015) allows attorneys to withdraw money from a client trust account as fees are earned and expenses incurred. If an attorney used this money as he or she was entitled to do, then he or she would have to have a backup plan—either sufficient cash reserves or a line of credit—if later ordered to comply with a disgorgement order. Attorneys practicing in other areas do not act at their own risk when they pay themselves fees they have rightfully earned. Second, the Act does not state what

defenses an attorney has to a disgorgement order. Here, Holwell told the trial court that she did not have the money, and no hearing was held on the matter. Rather, Christine's attorney proceeded immediately with a citation to discover assets and froze Holwell's bank accounts.[2] These concerns are serious, especially given that the Act contemplates that proceedings relating to interim attorney fees and costs be conducted in summary fashion. 750 ILCS 5/501(c-1)(1) (West 2014). Third, most people's wealth is typically concentrated in their homes and retirement accounts. The appellate court held that a party cannot be required to sell real estate to pay attorney fees (2017 IL App (3d) 150101, ¶ 20), and both the Third District in the present case and the First District in *Altman* held that retirement accounts cannot be considered when assessing a party's ability to pay fees. *Id.* ¶ 19; *Altman*, 2016 IL App (1st) 143076, ¶¶ 22-25. This would mean that the parties are able to maintain their wealth, while attorneys must forfeit their own property to allow the parties to keep litigating. Fourth, construing section 501(c-1)(3) to mean that lawyers must forfeit their own property raises due process concerns.[3]

¶ 31    We agree with the appellate court, *amici*, and Holwell that these concerns are substantial. Picture the case of a solo practitioner who earns $60,000 during the first year of representing a party in a contentious dissolution proceeding and applies those funds to overhead and operating expenses in the normal course of business. Holding that such funds are available for disgorgement would mean that the attorney could be ordered to pay all of that money in a lump sum to another party's counsel years later, despite the fact that the funds belonged to the attorney and he or she had used them in a way that he or she had every legal right to do. And if the attorney does not comply, he or she can be held in contempt and jailed. The present case shows that such concerns are not merely theoretical. Holwell represented Andrew for eight months and then was granted leave to withdraw. During this

---

[2]The parties disagreed over whether a disgorgement order is an enforceable judgment, and the trial court ruled that it was.

[3]Although this court has not had occasion to address the due process implications of section 501(c-1)(3)'s disgorgement provisions, the appellate court upheld this section under facial substantive and procedural due process challenges in *Kaufman, Litwin & Feinstein v. Edgar*, 301 Ill. App. 3d 826, 835-37 (1998). That court cautioned, however, that its rejection of a facial challenge did not preclude a finding that, in certain circumstances, the statute was being unconstitutionally applied. *Id.* at 836.

period, Holwell earned over $50,000. The trial court later ordered her to turn over $40,952.61 to Christine's counsel. Holwell did not turn the money over, and she explained to the court that she was not willfully disobeying its order but that she did not have the money. The court held her in indirect civil contempt, fined her, and sentenced her to jail. Moreover, Christine's attorney immediately put a freeze on Holwell's bank accounts and issued a citation to discover assets against her. If this was the way that the legislature intended the statute to work, and if this is the type of result that the legislature intended, then the legislature needs to say so explicitly in the statute. We are not going to construe the statute in a way that leads to absurd, unjust, or inconvenient results. See *Solon*, 236 Ill. 2d at 441.

¶ 32    Christine points out that construing the statute the other way could also lead to inequities and absurd results. Christine points out that one spouse may engage in a "scorched earth" campaign of liquidating the marital assets and using the money to pay his or her attorney. While this is indeed a concern, Holwell points out that the disadvantaged spouse has some remedies available, including (1) filing the petition for interim attorney fees at the beginning of the case and (2) seeking a preliminary injunction or temporary restraining order under section 501(a)(2)(i) (750 ILCS 5/501(a)(2)(i) (West 2014)) (allowing parties to seek a temporary restraining order or preliminary injunction "restraining any person from transferring, encumbering, concealing or otherwise disposing of any property except in the usual course of business or for the necessities of life"). By contrast, the Act provides no remedy for an attorney who is ordered to turn over money that the attorney no longer has.

¶ 33    The other interpretation of "available" was that set forth by the Second District in *Squire*. The Second District defined "available" as meaning that the funds "exist somewhere." *Squire*, 2015 IL App (2d) 150271, ¶ 22. It is impossible to know what *Squire* even meant with this definition. *Altman* assumed that the Second District meant that it does not matter whether the attorney has already spent the funds because, even then, the funds "exist somewhere." See *Altman*, 2016 IL App (1st) 143076, ¶ 33. *Amici* read *Squire* the same way and argue that it would be unfair to say that funds that "exist" in the hands of third parties they have been paid to are nevertheless "available" to Holwell to turn over to other attorneys. This is certainly a fair and reasonable reading of *Squire*, given that the Second District put no limit on the term "somewhere." This definition would seem directly contrary to the plain meaning of "available," as the funds would no longer be accessible, obtainable, or

immediately utilizable. In fairness to the Second District, however, it is possible that by "exist somewhere" it meant that the funds existed somewhere within the attorney's control. But this is problematic too, as once the funds are deposited in the lawyer's general account and comingled with fees from other cases, it would not be possible to say which funds are from which fees. The *Squire* court might also have meant that "exist somewhere" simply means that the lawyer has the financial ability to turn over the amount ordered disgorged, but this would impose a much greater burden on small firms and solo practitioners. Whatever *Squire* meant by "exist somewhere," the court's interpretation was driven largely by its belief that *Earlywine* settled this question. We have determined that *Earlywine* did not speak to the question before the court today, and thus *Squire*'s analysis is of limited relevance. We disagree with the *Squire* court's interpretation, and we hereby overrule that decision.

¶ 34    As we noted above, the appellate court in the present case modified *Altman*'s rule that earned fees are not subject to disgorgement. The Third District held that available funds are those funds that are being held for a client and that have not yet been earned by the attorney at the time the attorney receives notice of the petition for interim fees. 2017 IL App (3d) 150101, ¶ 25. The Third District adopted this test by analogy to section 510(a) of the Act (750 ILCS 5/510(a) (West 2014)), which provides that judgments for maintenance or support obligations may be modified only as to "installments accruing subsequent to due notice by the moving party of the filing of the motion for modification." (Internal quotation marks omitted.) 2017 IL App (3d) 150101, ¶ 23. The policy reasons for the Third District's holding are obvious: once an attorney receives notice of a fee petition, the attorney will have an incentive to earn his or her fees as quickly as possible, thus rendering them unavailable to be disgorged. Nevertheless, we must keep in mind that the primary goal of statutory construction is to ascertain and give effect to the intention of the legislature. *Jackson*, 2012 IL 111928, ¶ 48. It is impossible to believe that, if the legislature meant something as technical and specific as that "available funds" means "fees that have not been earned by an attorney prior to receiving due notice of a petition for interim attorney fees," it would not have said this in the statute. Moreover, section 510(a) shows that when the legislature means something like this, it says so explicitly. We stated above that we believe that the legislature needs to take another look at this statute. If the Third District's

interpretation was the legislature's intent, then the legislature should amend the statute to make its intention clear.

¶ 35　　　　For all of the above reasons, we believe that *Altman*'s interpretation is correct. "[F]unds earned by and paid to a party's lawyer in the normal course of representation for past services rendered are not 'available funds' within the meaning of section 501(c-1)(3)." *Altman*, 2016 IL App (1st) 143076, ¶ 36. This is a difficult question, and the policy concerns on both sides are substantial. It is not possible to construe the statute in such a way that will not lead to unfairness and inequitable results in some situations. We therefore proceed today with an abundance of caution. We believe that the legislature needs to take another look at section 501(c-1)(3) and make its intentions absolutely clear. Specifically, the legislature should define what it means by "available funds" and explain whether this includes fees that the attorney has already earned, whether attorneys who are no longer in the case may also be ordered to disgorge fees, and whether it is a defense to disgorgement that the attorney no longer has the money. Absent such an explanation from the legislature, we hold that fees that have been earned by an attorney are not subject to disgorgement. Here, there is no dispute that the amount that the trial court ordered disgorged from Holwell represented earned fees, and the parties stipulated that Holwell's fees were reasonable and necessary. Accordingly, we affirm the appellate court's judgment, which reversed both the disgorgement order and the finding of contempt. We likewise agree with the appellate court that there is not sufficient certainty and clarity in the record regarding the $13,000 in fees that had been paid to Boback but were being held by Holwell. 2017 IL App (3d) 150101, ¶ 34 n.1. The ownership of these funds was disputed, and we do not address them here.

¶ 36　　　　Affirmed.