(No. 90732.—)

*In re* MARRIAGE OF MARK E. KATES, Appellant,
and ANN M. KATES, Appellee.

*Opinion filed November 21, 2001.*

James W. Johnson, of Johnson, Stricklin, Waller & Chiligiris, of Decatur (Jessica Stricklin, of counsel), for appellant.

James E. Ryan, Attorney General, of Springfield (Joel D. Bertocchi, Solicitor General, and Diane M. Potts, Assistant Attorney General, of Chicago, of counsel), for appellee.

JUSTICE McMORROW delivered the opinion of the court:

The central issue in this appeal is whether, under section 7(b—5) of the Illinois Parentage Act of 1984 (Parentage Act) (750 ILCS 45/7(b—5) (West 2000)), deoxyribonucleic acid (DNA) test results disproving paternity are a condition precedent to the filing of an action to declare the nonexistence of the parent and child relationship. The appellate court held that such test results are a condition precedent to the filing of a section 7(b—5) action, and reversed the judgment of the circuit court of Macon County in favor of Mark Kates, who had filed a section 7(b—5) petition[1] without first obtaining DNA test

---

[1]Mark's section 7(b—5) action to declare the nonexistence of the father and child relationship is styled a "petition" even though section 7(b—5) states that "[a]ctions brought by the adjudicated father shall be brought by *verified complaint*." (Emphasis added.) 750 ILCS 45/7(b—5) (West 2000). The parties to this appeal as well as the courts below also refer to Mark's section 7(b—5) action as a petition. Accordingly, in this opinion Mark's section 7(b—5) action is termed a petition.

results. No. 4—00—0130 (unpublished order under Supreme Court Rule 23). We affirm the judgment of the appellate court.

## BACKGROUND

Mark Kates and Ann Kates were married in August 1990 in Decatur, Illinois. In late 1991 or early 1992, as a result of a home pregnancy test, Mark and Ann learned that Ann was pregnant. It is undisputed that Ann told Mark at this time that he was not the child's father. On August 9, 1992, Ann gave birth to a son, M.K. Mark signed the birth certificate as the child's father.

In June 1993 Mark filed a petition for dissolution of marriage in the circuit court of Macon County. In his petition, Mark alleged that M.K. was not his son, and he asked that his name be removed from the birth certificate. Ann filed her entry of appearance and consent to judgment. Neither Ann nor Mark was represented by an attorney.

On August 6, 1993, the day of the hearing on Mark's petition for dissolution of marriage, he and Ann reached an agreement under which Mark was to pay $20 a week in child support. They informed the court of this agreement. Following the hearing, the court entered a judgment for dissolution of marriage, finding that one child, M.K., was "born to the parties" on August 9, 1992. The court held that Mark was entitled to visitation with M.K. and ordered Mark to pay child support of $20 per week, beginning on August 13, 1993. The payments were to be made to the circuit clerk.

Ann subsequently began receiving public assistance from the Illinois Department of Public Aid. In January 1994, the Macon County circuit court ordered the clerk to forward Mark's child support payments to the Department of Public Aid.

On January 8, 1996, the Macon County State's Attorney, acting on behalf of the Department of Public Aid, filed a petition to modify Mark's child support payments,

seeking an increase in support. The State alleged that M.K.'s needs were not being met, as evidenced by the fact that he was receiving public assistance. The State also alleged that Mark was capable of paying an increased amount of child support.

About two weeks later (January 24, 1996), Mark filed a petition to modify or correct the judgment of dissolution of marriage "as to [the] paternity" of M.K. In his petition, Mark alleged that the original judgment for dissolution of marriage "mistakenly or improperly implied or indicated that the child born to the defendant [Ann] was a child 'born to the parties.' " Mark stated that he had undergone a vasectomy in 1984, prior to Ann's pregnancy, and that he was "unable to have children and has been unable to have children since 1984." According to Mark, Ann had told him that he was not the father, and that the actual father was P.W., a man with whom she had sexual relations at the time of M.K.'s conception. The State moved to dismiss Mark's petition to modify or correct judgment on the ground that it was substantially insufficient in law, and the court granted the motion to dismiss.

A hearing was held in June 1996 on the State's petition to increase Mark's child support. At the hearing, Mark stated that M.K. was not his child. He explained that he had agreed to pay Ann $20 a week in child support in order to "help her out." According to Mark, it was his understanding that the $20 support amount would never be changed.

Ann testified that she and Mark initially agreed that Mark's name would be taken off the birth certificate, but that Mark then decided he wanted to keep his name on the certificate and "keep visitation" with the child. According to Ann, Mark said he wanted to be the father of the child and wanted to raise it as his own. Ann stated that she told Mark he was not the child's father on the night when they did the home pregnancy test.

The court ordered Mark's child support payments

increased to $65 per week, finding that there had been "material changes in circumstances since the judgment [of dissolution of marriage] in that [Mark's] income ha[d] increased." The court also allowed Mark to claim M.K. for income tax purposes so long as Ann continued to receive public aid.

In May 1997 Mark filed a motion to abate his child support payments, alleging that he had been laid off from work the month before as a result of previous knee surgery and a back injury. Ann filed a cross-petition for rule to show cause why Mark should not be jailed for failure to pay child support. At the hearing on the motion and cross-petition, Mark again asserted that M.K. was not his child and that he and Ann had agreed that the original child support amount of $20 per week would never be changed. Ann conceded that she had agreed not to increase the child support, but said that after she began receiving public assistance, the Department of Public Aid stepped in and sought an increase. Ann had no control over this action. She also testified that during the divorce proceeding, Mark represented to the court under oath that M.K. was his child. According to Ann, the court advised Mark then that he would be held to be the father from that point on.

The court denied both Mark's motion and Ann's cross-petition, and held both parties in contempt for misrepresenting the fact of M.K.'s paternity to the court during the divorce proceeding. The court fined each of them $200.

On January 26, 1999, Mark filed a "Petition to Determine the Non-existence of the Father and Child Relationship" pursuant to section 7(b—5) of the Parentage Act (750 ILCS 45/7(b—5) (West 2000)). In his petition, Mark again asserted that he was incapable of fathering children because he had undergone a vasectomy in 1984. He asked the court to order Ann and M.K. to submit to DNA tests to determine the child's paternity. The State moved to dismiss Mark's petition, asserting that an

adjudicated father is barred from bringing a section 7(b—5) action unless he first obtains DNA test results showing that he is not the child's natural father. The court denied the State's motion to dismiss, and ordered the parties to submit to DNA testing. This testing confirmed that Mark was not the biological father of M.K.

At the hearing on Mark's section 7(b—5) petition, Mark acknowledged that he had undergone a vasectomy prior to his marriage and that Ann had told him that he was not M.K.'s father. Nevertheless, at the time that M.K. was born, Mark was still "uncertain" as to whether he was the father. However, as a result of the DNA testing ordered by the court, Mark was now "positive" that he was not the father. Ann repeated her previous testimony that when she and Mark learned that she was pregnant, she told Mark that he was not the father.

On July 26, 1999, the court entered an order declaring that Mark was not the father of M.K. and vacating all orders regarding custody, visitation and child support payments after January 26, 1999, the date when Mark filed his section 7(b—5) petition. According to this order, the DNA test results, which were entered into evidence by stipulation, showed that there was no possibility that Mark was the father of M.K.

Ann thereafter appealed. In reversing the trial court's ruling, the appellate court held that under the plain language of section 7(b—5), "all adjudicated fathers, as a condition precedent to filing a section 7(b—5) [action] must obtain DNA test results demonstrating that they are not the child's natural father." Mark had failed to obtain these test results, and his petition therefore failed to state a cause of action under the statute.

The court also held that Mark's cause of action was barred by the "paternity statute of limitations" as stated in section 8(a)(4) of the Parentage Act. Under this provision, a section 7(b—5) action is barred if brought more than six months after the (August 7, 1998) effective date of section 7(b—5) or more than two years after the

adjudicated father obtains "actual knowledge of relevant facts, whichever is later." 750 ILCS 45/8(a)(4) (West 2000). The court held that Mark's cause of action was barred under the two-year limitations period because it was brought more than two years after he obtained actual knowledge of relevant facts. The court added that "[e]ven if this action was brought within six months of the amendatory act of 1998, causes of action barred prior to the amendatory act were not reinstated by the Act." Thus the court appeared to find that Mark had actual knowledge more than two years prior to the section 7(b—5)'s effective date, and concluded that his cause of action was therefore time-barred before section 7(b—5) was enacted, and could not be "reinstated" even though Mark brought it within six months of August 7, 1998.

We granted Mark's petition for leave to appeal. 177 Ill. 2d R. 315. Before this court, Mark raises two main issues for consideration: (1) whether, under section 7(b—5) of the Parentage Act, an adjudicated father must obtain a DNA test disproving paternity prior to filing a section 7(b—5) action; and (2) whether Mark's section 7(b—5) action in this case is time-barred regardless of which limitations provision (either the six-month or the two-year period) is applicable.

## ANALYSIS

Section 7(b—5), which was added to the Parentage Act on August 7, 1998, "provides a new cause of action allowing an adjudicated father to challenge the adjudication 'if' DNA tests establish nonpaternity." *In re Marriage of Lubbs*, 313 Ill. App. 3d 968, 970 (2000). Prior to this amendment, a man adjudicated to be the father of a child could not challenge the adjudication "even where subsequent DNA evidence conclusively establishe[d] nonpaternity." *Lubbs*, 313 Ill. App. 3d at 970.

Section 7(b—5) provides that:

"An action to declare the non-existence of the parent and child relationship may be brought subsequent to an

adjudication of paternity in any judgment by the man adjudicated to be the father pursuant to the presumptions in Section 5 of this Act *if, as a result of deoxyribonucleic acid (DNA) tests, it is discovered that the man adjudicated to be the father is not the natural father of the child.* Actions brought by the adjudicated father shall be brought by verified complaint. If, as a result of the deoxyribonucleic acid (DNA) tests, the plaintiff is determined not to be the father of the child, the adjudication of paternity and any orders regarding custody, visitation, and future payments of support may be vacated." (Emphasis added.) 750 ILCS 45/7(b—5) (West 2000).

The central question presented in this appeal is the proper interpretation of section 7(b—5). In interpreting statutes, a court's primary goal is to ascertain and give effect to the true intent of the legislature. *Paris v. Feder*, 179 Ill. 2d 173, 177 (1997); *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990). "The best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning." *Paris*, 179 Ill. 2d at 177. When the plain language of the statute is clear and unambiguous, the legislative intent that is discernible from this language must prevail, and no resort to other interpretive aids is necessary. *Paris*, 179 Ill. 2d at 177; *Davis v. Toshiba Machine Co., America*, 186 Ill. 2d 181, 185 (1999). Statutes should be read as a whole with all relevant parts considered, and they should be construed, if possible, so that no term is rendered superfluous or meaningless. *Kraft*, 138 Ill. 2d at 189; *Advincula v. United Blood Services*, 176 Ill. 2d 1, 16-17, 26 (1996). Statutory interpretation is a question of law and is therefore reviewed *de novo*. *Yang v. City of Chicago*, 195 Ill. 2d 96, 103 (2001).

It is clear from the plain language of section 7(b—5) that the legislature did not intend for an adjudicated father to be able to bring a section 7(b—5) action without first obtaining DNA test results disproving paternity. As set forth above, the first sentence of section 7(b—5) states that:

"An action to declare the non-existence of the parent and child relationship may be brought subsequent to an adjudication of paternity in any judgment by the man adjudicated to be the father pursuant to the presumptions in Section 5 of this Act *if, as a result of deoxyribonucleic acid (DNA) tests, it is discovered that the man adjudicated to be the father is not the natural father of the child.*" (Emphasis added.) 750 ILCS 45/7(b—5) (West 2000).

The plain meaning of this language is that an action to declare the nonexistence of the parent and child relationship may be brought *only if* DNA test results show that the man adjudicated to be the father is not the natural father of the child.

An analysis of the structure of the sentence quoted above from section 7(b—5) bears out this interpretation. This first sentence of section 7(b—5) consists of two clauses: an independent clause (not italicized) which, were it not for the second clause, could stand alone as a complete thought, and a subordinate clause (italicized) that is dependent upon the main clause for its meaning and thus cannot stand by itself. See M. Semmelmeyer & D. Bolander, The New Webster's Grammar Guide: A Complete Handbook on English Grammar, Correct Usage and Punctuation 171 (1987). The relationship between the two clauses is shown by the subordinating conjunction "if," which is used to connect them. See Grammar Guide at 179; M. Shertzer, The Elements of Grammar 46 (1986). The use of the subordinating conjunction "if" signals that the subordinate clause places a condition on the operation of the main clause. See Grammar Guide at 181; Elements of Grammar at 46.

Thus the meaning of the first sentence in section 7(b—5) is implicit in its structure. The main clause, which states that a section 7(b—5) action may be brought by an adjudicated father if the adjudication was made pursuant to certain presumptions, is conditioned by the addition of the subordinate clause. As set forth above, the condition stated in this dependent clause is that DNA

test results must show that "the man adjudicated to be the father is not the natural father of the child." 750 ILCS 45/7(b—5) (West 2000). Accordingly, this is a condition precedent to the filing of a section 7(b—5) action, which, as noted, may be brought only *after* DNA test results disproving paternity have been obtained.

Our appellate court came to this same conclusion under similar facts in *In re Marriage of Lubbs*, 313 Ill. App. 3d 968 (2000). There, the respondent, who was the man adjudicated to be the father, alleged in his section 7(b—5) action that he was "reliably informed and believed deoxyribonucleic acid (DNA) tests would determine that he is not [the child's] biological father." *Lubbs*, 313 Ill. App. 3d at 969. The trial court dismissed the action for failure to allege DNA evidence establishing nonpaternity, and the appellate court affirmed. According to the appellate court, a section 7(b—5) action challenging an adjudication of paternity is permitted "only if DNA testing has established, *prior to the filing of the petition*, that the adjudicated father is not the natural father." (Emphasis in original.) *Lubbs*, 313 Ill. App. 3d at 970; see also *Donath v. Buckley*, 319 Ill. App. 3d 83, 87 (2001) ("Under the plain language of [section 7(b—5)] no person would have standing to file an action under section 7(b—5) until after the DNA test had been completed"), citing *Lubbs*, 313 Ill. App. 3d 968.

This interpretation of section 7(b—5) is also supported by another provision in the Parentage Act, section 8(a)(4), which, as noted, contains the statute of limitations applicable to section 7(b—5). Section 8(a)(4), which like section 7(b—5) became effective on August 7, 1998, provides in pertinent part that:

"An action to declare the non-existence of the parent and child relationship brought under subsection (b—5) of Section 7 of this Act shall be barred if brought more than 6 months after the effective date of this amendatory Act of 1998 or more than 2 years after the petitioner obtains

actual knowledge of relevant facts, whichever is later. *The 2-year period shall not apply to periods of time where the natural mother or the child refuses to submit to deoxyribonucleic acid (DNA) tests."* (Emphasis added.) 750 ILCS 45/8(a)(4) (West 2000).

As set forth above, according to the emphasized portion of section 8(a)(4), the two-year limitations period is tolled during any time when the natural mother or the child refuses to submit to DNA tests. If, as Mark contends, a section 7(b—5) action to challenge an adjudication of paternity may be filed without first obtaining DNA test results, there would be no need for this tolling provision. In such a case, if DNA test results disproving paternity were not a condition precedent to the filing of a section 7(b—5) action, it would not be necessary to toll the two-year limitations period for the time when the mother or child refuses to submit to such tests. Accepting Mark's interpretation here would render the tolling provision in section 8(a)(4) meaningless. See *Advincula*, 176 Ill. 2d at 16-17, 26 (statutes must be read as a whole and should be construed, if possible, so that no term is rendered superfluous or meaningless).

Notwithstanding the foregoing, Mark argues that DNA test results disproving paternity are not a condition precedent to the filing of a section 7(b—5) action, but rather are "a condition precedent to a finding that the man is not the father," which finding necessarily takes place after the section 7(b—5) action has been brought. Under this interpretation, the conditional clause in the first sentence of section 7(b—5) (requiring favorable DNA tests results) would refer not to the main clause in this same sentence, but rather to the criterion for a court to declare the nonexistence of the parent and child relationship. In support of this argument, Mark points to the third (and final) sentence in section 7(b—5), which, as set forth above, provides that:

"If, as a result of the deoxyribonucleic acid (DNA) tests, the plaintiff is determined not to be the father of the child,

the adjudication of paternity and any orders regarding custody, visitation, and future payments of support may be vacated." 750 ILCS 45/7(b—5) (West 2000).

Mark appears to argue that because this third sentence links favorable DNA test results to the availability of section 7(b—5) relief, it therefore supports his contention as to the meaning of the first sentence: that a favorable DNA test result is a condition precedent to a judicial finding of nonpaternity, and thus to the availability of relief. In each sentence, under Mark's interpretation, DNA results disproving paternity stand as a necessary prerequisite to the availability of relief.

This interpretation departs from the clear meaning revealed by a plain reading of the statute. As noted, the first sentence of section 7(b—5) consists of a subordinate clause (beginning with the word "if" and stating the requirement that DNA test results disprove paternity), which subordinate clause modifies or places a condition upon the main clause. In the first sentence, this main clause explicitly refers to the bringing of an action to declare the nonexistence of the parent and child relationship. It contains no reference to judicial findings of nonpaternity or to the availability of relief. Accordingly, the subordinate clause in the first sentence places a condition not upon judicial findings or upon the availability of relief, but rather upon the filing of a section 7(b—5) action.

A contrary construction would render the third sentence of section 7(b—5) redundant, since it also deals with the availability of section 7(b—5) relief. It is well settled that statutes should be construed, if possible, so that no term is rendered superfluous or meaningless. See *Advincula*, 176 Ill. 2d at 16-17, 26 (statutes must be read as a whole and should be construed, if possible, so that no term is rendered superfluous or meaningless); *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 270 (1998).

Mark next argues that section 11(a) of the Parentage

Act supports his reading of section 7(b—5). Section 11(a) provides that:

> "As soon as practicable, the court or an Administrative Hearing Officer in an Expedited Child Support System may, and upon request of a party shall, order or direct the mother, child and alleged father to submit to deoxyribonucleic acid (DNA) tests to determine inherited characteristics. If any party refuses to submit to the tests, the court may resolve the question of paternity against the party or enforce its order if the rights of others and the interests of justice so require." 750 ILCS 45/11(a) (West 2000).

Mark argues that under section 11(a), a circuit court has the power to order DNA testing at the request of a party to a paternity proceeding. The thrust of Mark's argument appears to be that if the court has the authority to order DNA testing, this renders meaningless any requirement that DNA test results disproving paternity be obtained prior to the filing of a section 7(b—5) action. This argument is without merit.

The plain language of section 11(a) shows that it does not apply to causes of action filed under section 7(b—5). As set forth above, section 11(a), which was enacted prior to section 7(b—5), states that a court "may, and upon request of a party shall, order or direct the mother, child and *alleged father* to submit to [DNA] tests to determine inherited characteristics." (Emphasis added.) 750 ILCS 45/11(a) (West 2000). As the emphasized terms indicate, section 11(a) applies only where there is an *alleged* father, and thus a question of paternity in the first instance. By contrast, section 7(b—5) applies not where the father has merely been alleged, but where he has already been adjudicated a legal father. In such cases, unlike section 11(a), the issue before the court is not a question of paternity in the first instance, but rather whether a previous adjudication of paternity should be vacated.

Further, if section 11(a) did apply to section 7(b—5) actions, it would conflict with section 8(a)(4) of the Parentage Act, which as noted was enacted along with sec-

tion 7(b—5) and contains the statute of limitations applicable to section 7(b—5). Section 8(a)(4) implicitly allows a mother or child to refuse to submit to DNA testing, since it provides for the tolling of the two-year limitations period during times when the mother or child so refuses.

There can be no question that it is section 8(a)(4) and not section 11(a) that applies here. As noted, the plain language of section 11(a) demonstrates that it applies only in cases where there is an alleged father, and not to causes of action under section 7(b—5), where the man has already been adjudicated a legal father. However, if there were a question as to which provision applies, it would be resolved in favor of section 8(a)(4), which specifically refers to the mother's or child's refusal to submit to testing, and thus is the more specific of the two provisions. See *Stone v. Department of Employment Security Board of Review*, 151 Ill. 2d 257, 266 (1992) (noting that in general, specific statutory provisions control over general provisions on the same subject).

Mark's next argument focuses not on the language of the statute but on the effect that would result from requiring DNA test results prior to the filing of a section 7(b—5) action. According to Mark, imposing such a condition precedent would have the effect of severely limiting the number of fathers who could make use of section 7(b—5). If the adjudicated father did not have custody of the child (and Mark claims that most such fathers do not), it would be difficult for him to obtain the required DNA tests, Mark contends, "since non-custodial parents cannot obtain elective medical procedures without the consent of the mother." Thus Mark implicitly argues that it is unreasonable to require DNA test results prior to the filing of a section 7(b—5) action. We disagree.

As previously indicated, section 7(b—5) creates a new cause of action that allows an adjudicated father to challenge a previous adjudication of paternity. *Lubbs*, 313 Ill. App. 3d at 970. In allowing such a challenge, section

7(b—5) essentially runs counter to the strong judicial policy favoring finality of judgments (*In re Marriage of O'Brien*, 247 Ill. App. 3d 745, 750-51 (1993); *In re Marriage of Halas*, 173 Ill. App. 3d 218, 223 (1988)), a policy that ·applies with special force to adjudications of paternity, given the impact of such adjudications on the interests of children (*cf. Paternity of Cheryl*, 434 Mass. 23, 32, 746 N.E.2d 488, 495-96 (2001) (noting that where there is a substantial father-child relationship and the father has provided the child with consistent emotional and financial support, "an attempt to undo a determination of paternity 'is potentially devastating to a child who has considered the man to be the father' "); *Godin v. Godin*, 168 Vt. 514, 523, 725 A.2d 904, 910 (1998) (noting that many courts have rejected attempts to reopen paternity judgments based on post-judgment blood tests or other evidence, "absent clear and convincing evidence that it serves the best interests of the child")).

In enacting section 7(b—5), the Illinois legislature determined that not every adjudicated father would be able to file an action to declare the nonexistence of the parent and child relationship. Instead, only those who first obtained a DNA test disproving paternity could bring such a challenge. See *Lubbs*, 313 Ill. App. 3d at 971 (concluding that section 7(b—5) "creates a *limited exception* to the rule that an adjudicated father is barred from challenging the adjudication" (emphasis added)).[2] It is

---

[2]As noted, it is clear from the plain language of the statute that the legislature intended to place this limitation on section 7(b—5). However, even if this intent were not clear, it would be borne out by the legislative history. During floor debate, the senate sponsor of the measure stated that:

> "[W]e are trying to narrow it because frankly we are not trying to open a Pandora's box, so that anybody could come in and say, 'Ah, I don't think that's my kid,' because we would have chaos." 90th Ill. Gen. Assem., Senate Proceedings, April 2, 1998, at 51 (statements of Senator Fawell).

·clear that the legislature is free to impose such limitations or conditions. See *Buzz Barton & Associates, Inc. v. Giannone*, 108 Ill. 2d 373, 383 (1985) (noting that "the legislature may impose reasonable limitations and conditions upon access to the courts"); *cf. Varelis v. Northwestern Memorial Hospital*, 167 Ill. 2d 449, 454 (1995) ("Acting within constitutional limits, the legislature is free to prescribe whatever requirements it might choose to impose on the availability of relief under the [Wrongful Death] Act"); *Wilson v. Tromly*, 404 Ill. 307, 310 (1949) ("[U]nder the provisions of [the Wrongful Death Act] the legislature, having conferred a right of action for death by wrongful act, may determine who shall sue, and the conditions under which the suit may be brought").

Given that section 7(b—5) creates a new cause of action that jeopardizes the finality of paternity adjudications, it is not unreasonable that the legislature chose to limit such an action to only those adjudicated fathers who first obtained DNA tests disproving paternity. We reject Mark's implicit argument that the imposition of such a limitation is unreasonable.

Finally, Mark argues that the appellate court erred in concluding that his section 7(b—5) cause of action was time-barred under both the two-year and the six-month limitations periods as stated in section 8(a)(4) of the Parentage Act. Section 8(a)(4) provides in pertinent part that:

> "An action to declare the non-existence of the parent and child relationship brought under subsection (b—5) of Section 7 of this Act shall be barred if brought more than 6 months after the effective date of this amendatory Act of 1998 or more than 2 years after the petitioner obtains actual knowledge of relevant facts, whichever is later." 750 ILCS 45/8(a)(4) (West 2000).

Mark concedes that he had actual knowledge of relevant facts more than two years prior to the filing of his section 7(b—5) action, and that it therefore was time-

barred under the two-year limitations period. However, he contends that the appellate court erred in concluding that because Mark had knowledge of relevant facts more than two years prior to the effective date of section 7(b—5), his cause of action was therefore barred prior to the enactment of section 7(b—5) *for purposes of the six-month limitations period as well.* As previously noted, after concluding that Mark's cause of action was time-barred under the two-year limitations period, the appellate court stated that "[e]ven if this action was brought within six months of the amendatory act of 1998, causes of action barred prior to the amendatory act were not reinstated by the Act." Mark notes that, unlike the two-year limitations period, the six-month period referred to in section 8(a)(4) contains no reference to "actual knowledge of relevant facts." According to Mark, this six-month period is unaffected by prior knowledge of relevant facts. Instead, it refers to a "6 month window [after the statute's effective date] for a 'legal father,' even one with actual knowledge, to file a new cause of action to declare that he is not the biological father *regardless of his prior knowledge of relevant facts.*" (Emphasis added.) Mark thus argues that the appellate court erred in concluding that his section 7(b—5) cause of action was "barred prior to the amendatory act" for purposes of the six-month limitations period. Because Mark's action was filed within six months of section 7(b—5)'s effective date, he contends that it was timely filed under this six-month period.

Whether Mark's section 7(b—5) action was filed within six months of section 7(b—5) amendment's August 7, 1998, effective date is irrelevant, given our previous disposition of the central issue in this appeal. We have already concluded that under the plain language of section 7(b—5), DNA test results disproving paternity are a condition precedent to the filing of a section 7(b—5) action. Because Mark did not obtain DNA test results

prior to filing his section 7(b—5) petition, his cause of action does not come within the scope of section 7(b—5) in the first instance. Therefore it does not matter whether he met the limitation period requirements of section 8(a)(4), which apply *only* to actions brought under section 7(b—5).

## CONCLUSION

For the foregoing reasons, we hold that pursuant to the plain language of section 7(b—5) of the Parentage Act, an adjudicated father must obtain DNA test results disproving paternity before filing a section 7(b—5) action to declare the nonexistence of the parent and child relationship. Because Mark did not obtain such DNA results prior to filing his petition, the trial court erred in granting his requested relief and declaring the nonexistence of the parent and child relationship. We therefore affirm the judgment of the appellate court reversing the circuit court's decision declaring the nonexistence of the parent and child relationship and vacating all orders regarding custody, visitation, and future child support.

*Affirmed.*