# Illinois Official Reports

## Appellate Court

*In re Marriage of Sparks*, 2018 IL App (1st) 180932

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF CAROLE L. SPARKS, Petitioner and Cross-Respondent-Appellant, and JOHNNY L. SPARKS, Respondent and Cross-Petitioner-Appellee. |
| District & No. | First District, First Division<br>Docket No. 1-18-0932 |
| Filed | December 3, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-D-630104; the Hon. Melissa A. Durkin, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Lake Toback DiDomenico, of Chicago (Michael G. DiDomenico, of counsel), for appellant.<br><br>Pinkston Law Group P.C., of Chicago (Danielle A. Pinkston, of counsel), for appellee. |
| Panel | JUSTICE PIERCE delivered the judgment of the court, with opinion.<br>Justices Griffin and Walker concurred in the judgment and opinion. |

**OPINION**

¶ 1    Johnny Sparks and Carole Sparks filed cross-petitions for dissolution of their marriage. The circuit court entered a judgment of dissolution of marriage that incorporated the parties' child custody settlement for J.S., a minor born to Carole during the marriage. After the entry of the judgment of dissolution of marriage, Johnny filed a petition in the circuit court to terminate his parent and child relationship with J.S. The circuit court granted Johnny's motion for genetic testing, and the results showed that Johnny is not J.S.'s biological father. The circuit court conducted a trial on Johnny's petition to determine when Johnny acquired actual knowledge of relevant facts concerning J.S.'s biological paternity. After trial, the circuit court determined that Johnny's petition was timely because it was filed within two years of Johnny acquiring actual knowledge of relevant facts regarding J.S.'s biological parentage. The circuit court ordered that Johnny was not J.S.'s legal or biological parent and vacated all of the previously entered orders related to Johnny's custody, allocation of parental responsibilities, visitation parenting time, child support, and financial support for J.S. Carole appeals. We affirm.

¶ 2                                I. BACKGROUND

¶ 3    Johnny Sparks and Carole Sparks were married on December 4, 1992. At the time of the marriage, Carole had one daughter from a previous relationship. During the course of Johnny and Carole's marriage, five children were born to or adopted by the parties, including J.S., who was born on May 27, 2004, and who is the only child that is still a minor. Johnny was therefore J.S.'s presumed father under section 204(a)(1) of the Illinois Parentage Act of 2015 (Act) (750 ILCS 46/204(a)(1) (West 2016)). Carole filed a petition for dissolution of marriage in February 2014, and Johnny subsequently filed a counter-petition for dissolution of marriage. During the course of the proceedings, the circuit court approved an agreed joint custody settlement agreement. On May 26, 2016, the circuit court entered a judgment for dissolution of marriage that incorporated the joint custody settlement and the parties' marital settlement agreement and addressed the parties' financial obligations for J.S.'s expenses.

¶ 4    In November 2016, Carole filed a petition for rule to show cause against Johnny for allegedly failing to pay his portion of J.S.'s private school tuition and expenses. Johnny filed a *pro se* response to Carole's petition, asserting in part that a July 7, 2016, DNA test showed that he was not J.S.'s biological father. In January 2017, Johnny filed through counsel an amended response to Carole's petition for rule to show cause, as well as a verified petition to terminate his parent and child relationship with J.S. pursuant to section 205 of the Act (*id.* § 205). Johnny then filed an amended petition—which is the petition at issue in this appeal—to terminate his parent-child relationship with J.S. pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2016)) and section 205(c) of the Act.

¶ 5    Johnny's amended petition alleged that in June 2016, shortly after the judgment for dissolution of marriage, Carole informed him for the first time that he was not J.S.'s biological father. Johnny asserted that prior to June 2016, he had no knowledge or reason to believe that he was not J.S.'s biological father. Johnny asserted that his petition was timely under section 205(c) of the Act because it was filed within two years of acquiring actual knowledge of relevant facts that he was not J.S.'s biological father. He also requested that the circuit court order an admissible DNA test pursuant to section 614 of the Act (750 ILCS 46/614 (West

2016)). Finally, Johnny requested that the circuit court vacate all of the child-related orders in the dissolution of marriage proceedings on the basis that Carole fraudulently concealed that he was not J.S.'s biological father until after the entry of the judgment for dissolution of marriage.

¶ 6 Carole moved to dismiss Johnny's amended petition pursuant to section 2-619.1 of the Code (735 ILCS 5/2-619.1 (West 2016)), asserting in relevant part that Johnny's section 2-1401 petition should be dismissed because Johnny failed to exercise due diligence in bringing his claim and that the amended petition failed to state a claim for fraud. Carole also opposed Johnny's request for genetic testing on the basis that Johnny's petition failed to state a claim to declare the nonexistence of a child and parent relationship. Carole's motion to dismiss was fully briefed. On July 20, 2017, the circuit court heard oral argument and denied Carole's motion to dismiss. The circuit court ordered Johnny, Carole, and J.S. to undergo a DNA test over Carole's objection that the circuit court had not yet conducted a hearing on Johnny's section 2-1401 petition. At no point in the proceedings on the amended petition did Carole request that the circuit court appoint a guardian *ad litem* or child representative for J.S., and no guardian *ad litem* or child representative was ever appointed by the circuit court. Carole's attorney was allowed to withdraw, and Carole filed a *pro se* motion to vacate and reconsider the circuit court's order requiring DNA testing, which in part referenced sections 205 and 610 of the Act (750 ILCS 46/205, 610 (West 2016)). The motion to reconsider was fully briefed, and the circuit court denied the motion.[1] Johnny, Carole, and J.S. submitted to genetic testing that confirmed that Johnny is not J.S.'s biological father.

¶ 7 The circuit court then held a trial on Johnny's amended petition. The circuit court heard testimony from the parties, as well as from Johnny's current wife Berenda Sparks, the parties' daughter Tiki Sparks, and Carole's daughter from her previous relationship, Iris Sparks, who is Johnny's stepdaughter. After hearing all of the testimony, the circuit court made credibility findings on the record and concluded that, prior to June 2016, Johnny did not have any actual knowledge of relevant facts that J.S. was not his biological daughter. The circuit court further concluded that Carole committed fraud by leading Johnny to believe that J.S. was his biological daughter. In a handwritten order dated April 19, 2018, the circuit court, in relevant part, granted Johnny's petition to terminate his parent and child relationship with J.S., ordered that Johnny was not J.S.'s "legal and/or biological father," and ordered that "all orders regarding custody, allocation of parental responsibilities, visitation parenting time, child support or financial support for the minor, J.S., are hereby vacated." Carole filed a timely notice of appeal.

¶ 8 II. ANALYSIS

¶ 9 We have jurisdiction over the circuit court's April 19, 2018, order pursuant to Illinois Supreme Court Rule 304(b)(3) (eff. Mar. 8, 2016), because that order granted Johnny's section

---

[1]Carole filed a notice of appeal from the denial of her motion to reconsider, which this court docketed as appeal No. 1-17-2518 and which we subsequently dismissed for want of prosecution. Carole's counsel on appeal correctly notes that we had no jurisdiction over appeal No. 1-17-2518, as there was no final judgment and there is no provision in our supreme court's rules permitting an interlocutory appeal from an order granting or denying a request for genetic testing. See Ill. S. Ct. R. 304(b) (eff. Mar. 8, 2016). Therefore, Carole's prior appeal has no preclusive effect on the present appeal.

2-1401 petition, and also pursuant to Rule 304(b)(6) (Ill. S. Ct. R. 304(b)(6) (eff. Mar. 8, 2016)) because the circuit court's order modified a judgment relating to the custody and allocation of parental responsibility. Furthermore, we find that we have jurisdiction over the circuit court's July 20, 2017, order granting Johnny's motion for genetic testing because that order was an integral part of the circuit court's April 19, 2018, judgment that Johnny was not J.S.'s legal or biological father.

¶ 10    On appeal, Carole first argues that the circuit court should have held a hearing pursuant to sections 401 and 610(b) of the Act to consider J.S.'s best interests prior to ordering genetic testing. We disagree based on the plain language of the Act.

¶ 11    When considering issues of statutory construction, our primary goal is to ascertain and give effect to the intention of the legislature. *In re Marriage of Goesel*, 2017 IL 122046, ¶ 13. The best indicator of legislative intent is the plain language of the statute, which must be given its plain and ordinary meaning. *Id.* We consider each provision of the statute in light of other relevant provisions of the statute. *Id.* Where the statutory language is clear and unambiguous, we must give effect to that language without resort to other aids of statutory construction. *Id.* Statutory construction is a question of law that we review *de novo*. *Id.*

¶ 12    Section 401 of the Act provides, in relevant part,

> "Proceeding authorized. As soon as practicable, a court or an administrative hearing officer in an Expedited Child Support System may, and upon the request of a party except as provided in Section 610 of this Act, or of the child, shall order or direct the mother, child, and alleged father to submit to deoxyribonucleic acid (DNA) testing to determine inherited characteristics." 750 ILCS 46/401 (West 2016).

The legislature's intent is clear: where a party or the child requests genetic testing, the circuit court "*shall* order or direct the mother, child, and alleged father to submit" to genetic testing. (Emphasis added.) *Id.*

¶ 13    The mandatory language of section 401 is limited by the specific reference to section 610 of the Act that gives the circuit court discretion to deny a motion for genetic testing after the circuit court considers certain factors. Section 610 of the Act provides, in relevant part,

> "§ 610. Authority to deny motion for genetic testing.
>
> (a) In a proceeding in which the parentage of a child having a presumed, acknowledged, or adjudicated parent is at issue, the court may deny a motion by a parent, presumed parent, acknowledged parent, adjudicated parent, alleged parent, or the child seeking an order for genetic testing of the parents and child if the court determines that:
>
>> (1) the conduct of the parent, acknowledged parent, adjudicated parent, or the presumed parent estops that party from denying parentage;
>>
>> (2) it would be inequitable to disprove the parent-child relationship between the child and the presumed, acknowledged, or adjudicated parent; and
>>
>> (3) it is in the child's best interests to deny genetic testing, taking into account the following factors[.]" *Id.* § 610(a).

The statute then lists 10 factors for the circuit court to consider relative to the child's best interest: (a) the length of time between the proceeding to adjudicate parentage and the time the presumed parent was on notice of possible nonparentage; (b) the length of time the presumed parent assumed the role of parent; (c) the facts surrounding discovery of possible

- 4 -

nonparentage; (d) the nature of the relationship between the child and the presumed, acknowledged, or adjudicated parent; (e) the child's age; (f) the harm to the child if parentage is disproved; (g) the nature of the relationship between the child and alleged parent; (h) the extent of the passage of time reduces the chance of establishing parentage in another and support obligations in favor of the child; (i) other factors affecting the equities from disrupting the parent-child relationship or the chance of harm to the child; and (j) any other equitable factors found by the court. *Id.* § 610(a)(3).

¶ 14 It is clear from the plain language of section 610(a) of the Act that the circuit court may exercise its discretion and deny a motion for genetic testing by a "parent, presumed parent, acknowledged parent, adjudicated parent, alleged parent, or the child" only after the circuit court has considered all of the relevant factors set forth in section 610(a) of the Act. *Id.* § 610(a). We must read this provision in harmony with section 401 of the Act, which provides that, on the motion of a party or the child, the circuit court "*shall* order or direct the mother, child, and alleged father to submit to" genetic testing. (Emphasis added.) *Id.* § 401. In other words, under section 401 the circuit court must presumptively order genetic testing when requested by a party or the child; however, this presumption may be rebutted after the circuit court considers the factors in section 610(a). After considering the factors contained in section 610(a), the circuit court may then exercise its discretion to deny a motion for genetic testing, effectively refusing to allow testing that would establish to a degree of scientific certainty whether a party is the biological parent of a child. In section 401, our legislature was free to make genetic testing the presumptive default, since such testing is readily available and can establish biological parentage with a high degree of scientific certainty. The legislature could have required a hearing on every motion for genetic testing so that the circuit court could consider the section 610(a) factors, but it did not do so. Instead, the legislature provided that, where a motion for genetic testing is made under section 401, the motion may be denied only where the circuit court finds the section 610(a) factors are present; where the circuit court finds those factors are not present, as in this case, the court must enter the order for genetic testing. Therefore, contrary to Carole's argument on appeal, the circuit court was not obligated to conduct a hearing to consider J.S.'s best interests prior to ordering genetic testing, and was presumptively obligated to order genetic testing as requested by Johnny after considering the section 610(a) factors.

¶ 15 Our above analysis is also largely dispositive of Carole's second argument on appeal, which is that section 610(b) of the Act required the circuit court to appoint a guardian *ad litem*, a child representative, or an attorney for J.S. prior to ordering genetic testing. Johnny argues, and we agree, that Carole forfeited the issue of whether the circuit court was required to appoint a guardian *ad litem*, a child representative, or an attorney for J.S. prior to ordering genetic testing because she never advanced this argument in the circuit court. Forfeiture aside, section 610(b) of the Act did not apply to these proceedings because, by its own terms, section 610(b) of the Act provides, in relevant part, "[i]n a *proceeding involving the application of this Section*, a minor or incapacitated child must be represented by a guardian *ad litem*, child's representative, or attorney for the child." (Emphasis added.) *Id.* § 610(b). We have already concluded that, when the circuit court grants a motion for genetic testing pursuant to section 410, section 610 of the Act is not applicable and thus, when the circuit court grants genetic testing, there is no "proceeding involving the application of" section 610 of the Act.

¶ 16    Carole relies on *In re Marriage of Tzoumas*, 187 Ill. App. 3d 723 (1989), and *In re Marriage of Ostrander*, 2015 IL App (3d) 130755, to argue that the circuit court's failure to appoint a guardian *ad litem*, child's representative, or attorney for J.S. was reversible error. Those cases are inapposite. In *Tzoumas*, the presumptive father, Harry Tzoumas, filed a section 2-1401 petition asserting in relevant part that he was not the biological father of a minor born during his marriage to his ex-wife Bobette Tzoumas. 187 Ill. App. 3d at 727. Bobette did not respond to Harry's petition. *Id.* The circuit court ultimately denied Harry's petition, and he appealed. *Id.* Bobette did not file a brief in the appeal. *Id.* at 726. We reversed, finding that Harry's petition set forth sufficient facts to entitle him to relief and therefore his petition should have not have been dismissed without an evidentiary hearing. *Id.* at 729-30. We further ordered that, on remand, the circuit court should appoint a guardian *ad litem* for the minor and conduct a hearing as to whether the minor's best interests were being protected in the section 2-1401 proceedings. *Id.* at 733. There, because Harry's position was clearly in conflict with the minor's interests, we were concerned that none of the minor's interests would be protected. The situation here is different, since Carole fully participated in the postdissolution proceedings and her interests in maintaining Johnny's presumed parentage of J.S. were aligned with the best interests of J.S.

¶ 17    In *Ostrander*, the presumptive father, Jerry Ostrander, filed a petition for dissolution of marriage from his wife Starr Ostrander. 2015 IL App (3d) 130755, ¶ 1. Jerry's petition asserted that one of the children born during the marriage—who was born eight years before the petition was filed—was not his biological child. *Id.* After genetic testing confirmed that the minor was not Jerry's biological child, he filed a motion for a finding of no paternity. *Id.* ¶ 5. The circuit court held a hearing at which Starr, acting *pro se*, stated that Jerry " 'knew from the day of conception' " that the minor was not his child. *Id.* ¶ 6. The circuit court found that Jerry was not the minor's father. *Id.* At the trial on the issue of child support, Starr, again acting *pro se*, testified that Jerry knew all along that the minor was not his biological child. *Id.* ¶ 7. The circuit court concluded that Jerry owed no child support. *Id.* ¶ 11. Starr obtained counsel and filed a motion to reconsider, arguing that the statute of limitations for Jerry to challenge his paternity lapsed prior to his petition for dissolution of marriage. *Id.* ¶ 12. The circuit court denied the motion to reconsider, and Starr appealed. *Id.* ¶ 14. We reversed the circuit court's judgment, finding that Jerry's assertion of nonpaternity was barred by the statute of limitations. *Id.* ¶¶ 25-29. We also noted that Starr acted *pro se* during the circuit court proceedings, "leaving no one to advocate for the child." *Id.* ¶ 30. We observed that, "when a court finds that a child's interests are not properly represented, it has a duty to appoint a guardian *ad litem*." *Id.* (citing *In re Parentage of Griesmeyer*, 302 Ill. App. 3d 905, 913 (1998)). We concluded that the minor's interests were not adequately represented and instructed that the circuit court appoint a guardian *ad litem* on remand for setting child support. *Id.*

¶ 18    Here, unlike in *Tzoumas*, Carole participated in all of the proceedings in the circuit court, and unlike in *Ostrander*, she was represented by counsel during briefing on Johnny's request for genetic testing and at the trial on the amended petition. In *Tzoumas* and *Ostrander*, we were concerned that there was either no representation of the minor's interests or an inadequate representation of interests aligned with those of the minor. Here, Carole's interests were directly aligned with J.S.'s interests, as the proceedings inured to both of their benefit. We also note that the circuit court repeatedly advised Johnny and Carole to consider J.S.'s interests and the effect of the proceedings on her. Under the circumstances here, where no party requested a

guardian *ad litem*, the parties were represented by counsel, and Carole's interests were aligned with J.S.'s, we cannot say that the circuit court was required to *sua sponte* appoint a guardian *ad litem*, a child representative, or an attorney for J.S. prior to ordering genetic testing.

¶ 19    Next, Carole argues that the circuit court erred by excluding evidence of J.S.'s best interests from trial and by failing to consider J.S.'s best interests when granting Johnny's amended petition. She relies on our supreme court's decision in *In re Marriage of Kates*, 198 Ill. 2d 156, 170 (2001), to argue that the court has relied on *Godin v. Godin*, 725 A.2d 904, 910 (Vt. 1998), for the proposition that "many courts have rejected attempts to reopen paternity judgments based on post-judgment blood tests or other evidence, 'absent clear and convincing evidence that it serves the best interests of the child.' " Carole's reliance on *Kates* is misplaced, and she misstates our supreme court's reliance on *Godin*.

¶ 20    In *Kates*, our supreme court addressed the question of whether, under section 7(b-5) of the Illinois Parentage Act of 1984 (1984 Act) (750 ILCS 45/7(b-5) (West 2000) (repealed by Pub. Act 99-85, § 977 (eff. Jan. 1, 2016))), a DNA test disproving paternity was a condition precedent to filing an action to declare the nonexistence of the parent and child relationship. *Kates*, 198 Ill. 2d at 157. Our supreme court concluded that it was. *Id.* at 164-65. The court rejected the father's arguments that it was unreasonable to require a DNA test result prior to filing an action to declare the nonexistence of the parent and child relationship, explaining that section 7(b-5) of the 1984 Act created a new cause of action allowing the adjudicated father to challenge a previous adjudication of paternity, which

> "essentially runs counter to the strong judicial policy favoring finality of judgments [citations], a policy that applies with special force to adjudications of paternity, given the impact of such adjudications on the interests of children [citation]; [*Godin*, 725 A.2d at 910] (noting that many courts have rejected attempts to reopen paternity judgments based on post-judgment blood tests or other evidence, 'absent clear and convincing evidence that it serves the best interests of the child'))." *Id.* at 170.

The court then observed that our legislature was free to determine "that not every adjudicated father would be able to file an action to declare the nonexistence of the parent and child relationship. Instead, only those who first obtained a DNA test disproving paternity could bring such a challenge." *Id. Kates* does not stand for the proposition that a court must consider the best interests of the child when considering whether to reopen a paternity judgment. Carole cites no other authority in support of her argument that the circuit court here was required to consider J.S.'s best interests at the trial on Johnny's petition. Carole's failure to develop her argument supported by relevant authority results in the rejection of her argument.

¶ 21    Next, Carole argues that Johnny's amended petition under section 205(c) of the Act was barred by the two-year statute of limitations set forth in section 205(d) of the Act. She further contends that Johnny had the burden to prove by clear and convincing evidence that he did not have actual knowledge of relevant facts concerning J.S.'s biological paternity because J.S. was born to Carole during Johnny and Carole's marriage and Johnny was presumed to be J.S.'s parent. 750 ILCS 46/204(a)(1) (West 2016). We disagree with both of Carole's arguments.

¶ 22    Section 205(c) of the Act provides:

> "An action to declare the non-existence of the parent-child relationship may be brought subsequent to an adjudication of parentage in any judgment by the man adjudicated to be the parent pursuant to a presumption in paragraphs (a)(1) through (a)(4) of Section 204 if, as a result of deoxyribonucleic acid (DNA) testing, it is discovered that the man

adjudicated to be the parent is not the father of the child. Actions brought by the adjudicated father shall be brought by verified petition. If, as a result of the deoxyribonucleic acid (DNA) testing that is admissible under Section 614 of this Act, the petitioner is determined not to be the father of the child, the adjudication of paternity and any orders regarding the allocation of parental responsibilities, parenting time, and future payments of support may be vacated." *Id.* § 205(c).

¶ 23    Section 205(d) of the Act provides, in relevant part, that a petition under section 205(c) "shall be barred if brought more than 2 years after the petitioner obtains actual knowledge of relevant facts. The 2-year period shall not apply to periods of time where the birth mother or the child refuses to submit to deoxyribonucleic acid (DNA) testing." *Id.* § 205(d).

¶ 24    "When a statute of limitations is raised as an affirmative defense, the burden of proof is placed upon the party seeking to prevent the operation of the statute to show that he falls within the 'discovery' exception of the statute." *Ostrander*, 2015 IL App (3d) 130755, ¶ 24. Whether a statute of limitations acts to bar a cause of action is a question of law reviewed *de novo*. *Id.* ¶ 21. However, the issues of whether and when Johnny had actual knowledge of relevant facts that J.S. was not his biological daughter are questions of fact. In this case, the circuit court heard testimony on this issue, made credibility determinations, and made findings of fact. The circuit court is in the best position to review the evidence and weigh the credibility of the witnesses. *In re Marriage of Bates*, 212 Ill. 2d 489, 515-16 (2004). We review the circuit court's factual findings under the manifest weight of the evidence standard. *Southwest Bank of St. Louis v. Poulokefalos*, 401 Ill. App. 3d 884, 890 (2010). "A finding [of fact] is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Id.*

¶ 25    Carole argues that Johnny had to prove by clear and convincing evidence that he did not have actual knowledge of relevant facts concerning his biological paternity. Carole's argument is premised on a misunderstanding of section 206 of the Act, which provides, "[a] person challenging a presumption under Section 204 of this Act may rebut the presumption with clear and convincing evidence." 750 ILCS 46/206 (West 2016). Here, at the time of trial, the court-ordered genetic testing had already firmly established that Johnny was not J.S.'s biological father, and thus Johnny had already rebutted the presumption in section 204(a) by clear and convincing evidence. Furthermore, Carole cites no authority to support her contention that section 206 of the Act imposes on Johnny a burden of demonstrating that his petition was timely by clear and convincing evidence, as section 206 of the Act only regulates the presumption in section 204(a) of the Act about when a man is presumed to be the father of a child that is born during a marriage. As set forth in section 901 of the Act, "[a]bsent a burden of proof specifically set forth in this Act, the burden of proof shall be by a preponderance of the evidence." *Id.* § 901. We therefore reject Carole's argument that Johnny had a burden to prove that his petition was timely by clear and convincing evidence.

¶ 26    We now turn to the evidence adduced at trial to determine whether the circuit court's finding that Johnny did not have any actual knowledge of relevant facts regarding whether he was J.S.'s biological father until June 2016 was against the manifest weight of the evidence. We conclude that the circuit court's findings of fact are not manifestly erroneous.

¶ 27    At trial, Johnny called Carole as an adverse witness, and she gave the following testimony. Carole began having an affair with Arnold Rogers starting in 1994. J.S. was conceived in either August or September 2003, and Rogers is J.S.'s biological father. In a sworn affidavit filed in

- 8 -

this case, Carole averred that she told Johnny that she had other sexual partners and that it was possible that J.S. was not Johnny's biological daughter. At trial, she acknowledged that the statement in her affidavit was not accurate; instead, while pregnant with J.S., Carole told Johnny that he could obtain a paternity test if he wanted to. Around the time that J.S. was conceived, Carole and Johnny were not having sexual intercourse, and they were sleeping in separate bedrooms. In December 2003, while at their home with their other children present, she told Johnny that she was pregnant. His response was, "that's not my baby." She never told Johnny that he was or was not J.S.'s biological father. Carole denied telling Johnny in a phone conversation in May 2016 that he was not J.S.'s biological father.

¶ 28    Berenda Sparks testified that she and Johnny were married in June 2017. In May 2016, she was in her truck with Johnny when Carole called Johnny's cell phone from an unrecognized number. Johnny put the call on speakerphone because he is primarily deaf in one ear. Berenda recognized Carole's voice, as the two had spoken to one another over 40 times. During the call, Carole asked Johnny to pay his share of J.S.'s past-due school expenses, and she told him that he would pay the expenses whether J.S. was his child or not. Within a week of the call, Johnny asked Berenda to purchase a DNA test from Walmart. Berenda made the purchase with Johnny's Walmart card. She could not recall the precise date of Carole's phone call, what day of the week it was, or how long the phone call lasted.

¶ 29    Johnny testified that he received a phone call from Carole while he was driving with Berenda in her truck. He felt "shocked" and "empty" after Carole's call. In 2003, he and Carole were having unprotected sexual intercourse three or four times a week. He denied that Carole told the family she was pregnant and denied responding "that's not my baby." Johnny knew Rogers, but did not know or think that Carole was having an affair with him. On cross-examination, Johnny testified that he received Carole's phone call on a Sunday. He acknowledged that at his deposition he stated that he purchased the DNA test from Walgreens, and he gave the same testimony at trial. Johnny acknowledged receipts from J.S.'s school reflecting that payments were made from his credit card to the school on May 6, 2016, and May 23, 2016. He did not know whether the school was owed any more money at the time of Carole's phone call. He also acknowledged two e-mails that he received from Carole regarding financial matters dated June 1, 2016, and June 2, 2016, which he testified he received after the phone call from Carole.

¶ 30    Carole testified again in her case-in-chief. She testified that, in 2003, her sister was very sick. Carole visited her sister almost every day. She testified that, in August and September 2003, she and Johnny were not having sexual intercourse. She denied making the phone call described by Berenda and Johnny. She stated that, at the time of the alleged phone call, J.S.'s tuition and school expenses were paid in full until the next school year. On cross-examination, Carole retracted another statement contained in a sworn affidavit that she filed in connection with her motion to dismiss. In that affidavit, Carole averred that, when she was pregnant with J.S., she and Johnny "discussed the fact that [Carole] had another sexual partner around the time [she] became pregnant, and it was possible that Johnny was not [J.S.'s] biological father." At trial, Carole recanted that statement, explaining that her attorney must have misunderstood what she was saying when drafting the affidavit. She also claimed that, in 2004, she was off of work and pregnant with J.S. and Johnny told her to find a way to pay her own bills because "that's not my baby." She testified that Johnny never asked her for a paternity test because, at

the time J.S. was conceived, she and Johnny were not sexually active and Johnny knew that J.S. was not his biological child.

¶ 31 Tiki Sparks testified that she was the daughter of Johnny and Carole and she learned in December 2003 that Carole was pregnant when Carole told the family in their home. Tiki testified that Johnny, upon learning that Carole was pregnant, said that he did not think that it was his baby. Tiki testified that her mother's sister Lori was very sick in August and September 2003 and that Carole visited Lori very often.

¶ 32 Iris Sparks testified that she is Carole's daughter and Johnny's stepdaughter. She lived with them in 2003 and described Johnny and Carole's relationship as sometimes "cruel" and "aggressive." Carole would visit her sick sister every day. Johnny and Carole slept in separate bedrooms. Iris was not there when Carole purportedly told the family that she was pregnant. Iris overheard her parents arguing about bills and believed that those arguments were based on accusations of extramarital affairs. She recalled a time in April 2004 when Johnny asked Carole if she was sleeping with certain coworkers of hers. As of February 2018, Iris had not spoken to Johnny in two years because her phone number was blocked and Berenda would purportedly hang up the phone if she knew that Iris was calling.

¶ 33 After hearing all of the testimony, the circuit court made the following findings. Both Johnny's and Carole's petition for dissolution of marriage, as well as the joint custody settlement agreement, made representations that J.S. was born to the parties during the marriage and was the biological daughter of the parties. Johnny was listed on J.S.'s birth certificate as J.S.'s biological father. The circuit court found that both parties held J.S. out as Johnny's biological daughter. Carole made a phone call to Johnny following the judgment of dissolution of marriage, during which Carole made a statement regarding the parentage of J.S. At the time Johnny entered into the joint custody settlement agreement and the dissolution of marriage judgment, he was under the false belief that J.S. was his biological daughter, and Carole's subsequent phone call led him to conduct a DNA test. Carole made a number of false statements in her pleadings, and her trial testimony was not credible. Johnny testified credibly that he and Carole were sexually active in 2003 and he believed he was J.S.'s biological father until he received Carole's phone call. Tiki's and Iris's testimony appeared "coached." The court-ordered genetic testing proved that Johnny was not J.S.'s biological father. Johnny exercised due diligence in bringing his petition to terminate his child and parent relationship with J.S. under section 2-1401 of the Code, and Johnny brought his petition pursuant to section 205(c) of the Act within two years of obtaining actual knowledge that he was not the biological father of J.S.

¶ 34 In light of the trial testimony and the circuit court's findings of fact, we must reject Carole's argument that Johnny did not meet his burden to show that his amended petition was timely under section 205(d) of the Act. Carole argues that the circuit court's finding that Carole's phone call occurred ignored inconsistencies in Johnny's and Berenda's testimony. She argues that Johnny and Berenda had "every incentive to lie" about the call, that neither could recall exactly when the phone call occurred, and that they gave conflicting statements about who purchased the DNA test and from where.

¶ 35 The circuit court, however, heard all of the testimony from all of the witnesses and was in the best position to determine the witnesses' credibility. It is accurate that there were inconsistencies in Johnny's and Berenda's testimony, but both testified that a phone call occurred in which Carole made a statement to the effect that Johnny might not be J.S.'s

biological father and that Johnny thereafter performed a DNA test. The circuit court also heard the conflicting testimony from Johnny and Carole regarding when Johnny had actual knowledge of relevant facts concerning J.S.'s biological paternity. The circuit court did not find Carole or Tiki credible, and those were the only two witnesses who testified that Carole told the family in 2003 that she was pregnant and that Johnny made statements to the effect of "that's not my baby." Having considered all of the testimony, the circuit court concluded that Johnny did not have knowledge of relevant facts concerning J.S.'s biological paternity until sometime in or around June 2016. Giving deference to the circuit court's credibility determinations, we cannot say that the circuit court's findings of fact are against the manifest weight of the evidence. Johnny therefore demonstrated that his amended petition to terminate the parent and child relationship was timely under section 205(d) of the Act, as it was filed within two years of Johnny obtaining actual knowledge of relevant facts that he was not J.S.'s biological father.

¶ 36    We also must reject Carole's argument that Johnny did not establish fraud. The circuit court concluded that both parties made numerous representations to the effect that Johnny was J.S.'s biological father when that was not true. Until Carole's phone call, Johnny had no reason to believe that J.S. was not his biological daughter. Carole knew that she was having an affair around the time that J.S. was conceived, and her testimony that Johnny knew that J.S. was not his biological daughter strongly suggests that Carole, at a minimum, had doubts about who was J.S.'s biological father. Yet she kept that information to herself while continuing to make representations in the dissolution proceedings that J.S. was born to the parties during the marriage. The circuit court's finding that Carole fraudulently concealed from Johnny facts about who J.S.'s biological father was is not against the manifest weight of the evidence.

¶ 37    Finally, Carole argues that Johnny did not establish due diligence for the purposes of section 2-1401 of the Code in asserting his claim to terminate his child-parent relationship with J.S. She argues that Johnny had results from the initial DNA test in June 2016 but that Johnny did not raise any arguments or assert any claims related to the results of that test until December 2016. Furthermore, she argues that Johnny did not present any evidence at trial to establish his due diligence.

¶ 38    Carole does not direct our attention to any authority to support the proposition that the due diligence requirements applicable to petitions under section 2-1401 of the Code apply to petitions under section 205(c) of the Act, or to petitions under section 7(b-5) of the 1984 Act (750 ILCS 46/7(b-5) (West 2000)).[2] Our research has only revealed cases that discuss section 2-1401 petitions in the context of a father who is conclusively determined to be a child's father on the basis of a voluntary acknowledgement of paternity. See *People ex rel. Department of Public Aid v. Smith*, 212 Ill. 2d 389, 399 (2004) (observing that "the legislature intended for actions under section 6(d) of the Parentage Act (challenging voluntary acknowledgments of paternity on the basis of fraud, duress, or material mistake of fact) to be brought by means of a section 2-1401 petition"); see also *In re Paternity of an Unknown Minor*, 2011 IL App (1st) 102445, ¶ 4 ("A presumed father has standing to challenge his voluntary acknowledgment of

_____

[2]Section 7(b-5) of the 1984 Act provided, in relevant part, "An action to declare the non-existence of the parent and child relationship may be brought subsequent to an adjudication of paternity in any judgment by the man adjudicated to be the father pursuant to the presumptions in Section 5 of this Act ***." 750 ILCS 46/7(b-5) (West 2000).

paternity only on the basis of fraud, duress, or material mistake of fact, and he would have to meet the standards of section 2-1401 of the [Code].”). However, *Smith* expressly acknowledged the difference between the conclusive nature of a voluntary acknowledgement of paternity and the rebuttable presumption of paternity that arises when a child is born during a marriage. *Smith*, 212 Ill. 2d at 404-05. In sum, we have not found any authority to support Carole’s contention that a man presumed to be the father of a child by virtue of section 204(a)(1)-(4) of the Act must satisfy the due diligence requirements for a section 2-1401 petition when challenging paternity through a petition filed pursuant to section 205(c) of the Act.

¶ 39    But even if those due diligence requirements applied, we would find no basis to disturb the circuit court’s judgment. Under the circumstances here, Johnny had no actual knowledge of relevant facts about whether he was J.S.’s biological father until June 2016, which came immediately on the heels of the dissolution of marriage judgment. At trial, Johnny testified that he felt shocked and empty after his phone conversation with Carole. As the circuit court repeatedly observed, a decision to terminate a child and parent relationship is a significant one. It is not difficult to imagine that Johnny might grapple with the fairly momentous decision to terminate his child and parent relationship with J.S.—whom he had been raising as his own child for over a decade—on the revelation that he had been deceived regarding J.S.’s biological paternity. Therefore, even if Johnny’s petition was subject to due diligence requirements, we would find that a roughly six-month delay between Johnny obtaining actual knowledge of relevant facts about J.S.’s biological paternity and bringing his petition to terminate the child and parent relationship satisfied the due diligence standard, particularly where the petition was timely under section 205(d) of the Act.

¶ 40                                   III. CONCLUSION

¶ 41    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 42    Affirmed.